# Exhibit I

```
 1                    UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA
                          SAN JOSE DIVISION
 3

 4      FUZZYSHARP TECHNOLOGIES,
        INCORPORATED,
 5                                     CASE NO.  CV-10-01844-JW
                    PLAINTIFF,
 6                                     SAN JOSE, CALIFORNIA
            VS.
 7                                     NOVEMBER 1, 2010
        NVIDIA CORPORATION, ET AL.,
 8                                     PAGES 1 - 14
                    DEFENDANTS.
 9

10

                       TRANSCRIPT OF PROCEEDINGS
11                 BEFORE THE HONORABLE JAMES WARE
                     UNITED STATES DISTRICT JUDGE
12
                      A-P-P-E-A-R-A-N-C-E-S
13
        FOR THE PLAINTIFF:   NIRO, HALLER & NIRO
14                           BY:  MATTHEW G. MCANDREWS
                             SUITE 4600
15                           181 WEST MADISON STREET
                             CHICAGO, ILLINOIS 60602
16

17      FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
                             BY:  NEEL CHATTERGEE
18                                JESSE CHENG
                             1000 MARSH ROAD
19                           MENLO PARK, CALIFORNIA 94025

20                           ALSTON & BIRD
                             BY:  SEAN DEBRUINE
21                           SUITE 150
                             275 MIDDLEFIELD ROAD
22                           MENLO PARK, CALIFORNIA 94025

23      OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
                                   CERTIFICATE NUMBER 8074
24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
        TRANSCRIPT PRODUCED WITH COMPUTER.
```

```
        1    SAN JOSE, CALIFORNIA                    NOVEMBER 1, 2010

        2                   P R O C E E D I N G S

        3         (COURT CONVENED.)

09:30AM 4              THE CLERK:  CALLING CASE NUMBER 10-1844, FUZZYSHARP

09:30AM 5    TECHNOLOGIES, INCORPORATED, VERSUS NVIDIA CORPORATION, ET AL.

09:30AM 6         ON FOR DEFENDANT'S MOTION TO DISMISS.  TEN MINUTES EACH

09:30AM 7    SIDE.

09:30AM 8         COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

09:30AM 9              MR. MCANDREWS:  GOOD MORNING, YOUR HONOR.  MATT

09:30AM 10   MCANDREWS ON BEHALF OF PLAINTIFFS FUZZYSHARP TECHNOLOGIES.

09:30AM 11             MR. CHATTERGEE:  GOOD MORNING, YOUR HONOR.  NEEL

09:30AM 12   CHATTERGEE AND JESSE CHENG ON BEHALF OF NVIDIA.

09:30AM 13             MR. DEBRUINE:  SEAN DEBRUINE FROM ALSTON & BIRD ON

09:30AM 14   BEHALF OF DELL.

09:30AM 15             THE COURT:  WELCOME ALL.  THIS IS DEFENDANT'S

09:30AM 16   MOTION, NVIDIA'S MOTION TO DISMISS.

09:30AM 17             MR. CHATTERGEE:  YES, YOUR HONOR.

09:30AM 18             THE COURT:  DO YOU WANT TO SPEAK FURTHER TO YOUR

09:30AM 19   MOTION?

09:30AM 20             MR. CHATTERGEE:  SURE, YOUR HONOR.  PARDON ME.  I

09:30AM 21   HAVE A LITTLE BIT OF A COUGH TODAY.

09:30AM 22        OUR MOTION TO DISMISS IS BASICALLY ASKING THE COURT TO

09:31AM 23   ADOPT A DEFENSIVE COLLATERAL ESTOPPEL BASED UPON JUDGE

09:31AM 24   ARMSTRONG'S RULING INVALIDATING THE CLAIMS OF FUZZYSHARP.

09:31AM 25        THAT CASE IS CURRENTLY ON APPEAL TO THE FEDERAL CIRCUIT.
```

| 09:31AM | 1 | WE FILED OUR MOTION BACK IN MAY OF THIS YEAR.  THE |

09:31AM  1      WE FILED OUR MOTION BACK IN MAY OF THIS YEAR.  THE

09:31AM  2   DEFENDANT -- THE PLAINTIFF DID NOT OPPOSE THE MOTION.  SO AT

09:31AM  3   THIS POINT I DON'T KNOW WHAT THEIR -- WHAT ARGUMENT THEY HAVE

09:31AM  4   AND IN OPPOSITION TO IT I TREAT IT AS A NON-OPPOSITION.

09:31AM  5      AND WE JUST ASK THE COURT TO GRANT THE MOTION.  WE SET

09:31AM  6   FORTH OUR REASONS IN THE PAPERS THAT ARE VERY STRAIGHTFORWARD

09:31AM  7   UNDER THE COLLATERAL ESTOPPEL DOCTRINE.

09:31AM  8      THEY HAVE LOST IN THE EARLIER CASE.  COLLATERAL ESTOPPEL

09:31AM  9   APPLIES.  ONCE JUDGMENT IS ENTERED, THAT MATTER IS ON APPEAL

09:31AM  10  AND THE CASE AT THIS POINT SHOULD BE DISMISSED.

09:32AM  11         THE COURT:  NO OPPOSITION.

09:32AM  12         MR. MCANDREWS:  THERE IS AN OPPOSITION.  LAW HAS

09:32AM  13  BEEN IN THE STATE OF FLUX.  AS RECENTLY AS SEVERAL WEEKS AGO

09:32AM  14  WHEN WE HAD A TELECONFERENCE, I RAISED THE POSSIBILITY WITH

09:32AM  15  OPPOSING COUNSEL OF STAYING THIS PROCEEDING PENDING THE FEDERAL

09:32AM  16  CIRCUIT'S REVIEW AND ANALYSIS OF JUDGE ARMSTRONG'S OPINION ON

09:32AM  17  WHICH THEY BASE THEIR COLLATERAL ESTOPPEL ARGUMENT.

09:32AM  18      I THINK THE ANALYSIS HERE IS VERY STRAIGHTFORWARD.  IF I

09:32AM  19  MIGHT?

09:32AM  20         THE COURT:  I'M WORRIED ABOUT WHETHER OR NOT YOU'RE

09:32AM  21  PROPERLY BEFORE THE COURT.

09:32AM  22      OUR RULES HAVE NOT BEEN IN A STATE OF FLUX.  IF YOU WANT

09:32AM  23  TO OPPOSE IT, YOU HAVE TO OPPOSE IT.

09:32AM  24      IF YOU DON'T OPPOSE IT, I ASSUME YOU'RE NOT OPPOSING IT.

09:32AM  25         MR. MCANDREWS:  WELL, THERE ARE A FEW POSSIBILITIES

| | | |
|---|---|---|
| 09:32AM | 1 | WITH RESPECT TO HOW YOUR HONOR RULES ON THIS, AND I THINK IN |
| 09:32AM | 2 | THE INTEREST OF JUDICIAL ECONOMY, THE PARTIES MIGHT CONSIDER, |
| 09:32AM | 3 | OR THE COURT MIGHT CONSIDER, STAYING YOUR HONOR'S RULING ON |
| 09:32AM | 4 | THIS PENDING THE FEDERAL CIRCUIT'S CONSIDERATION OF JUDGE |
| 09:33AM | 5 | ARMSTRONG'S RULING. |
| 09:33AM | 6 | THE FACT OF THE MATTER IS THIS, YOUR HONOR, JUDGE |
| 09:33AM | 7 | ARMSTRONG INVALIDATED 5 OF 100 PATENT CLAIMS, OKAY.  THOSE WERE |
| 09:33AM | 8 | THE ONLY 5 PATENT CLAIMS THAT WERE BEFORE JUDGE ARMSTRONG |
| 09:33AM | 9 | ASSERTED BY MY CLIENT.  THAT DOES NOT HAVE THE LEGAL |
| 09:33AM | 10 | CONSEQUENCE OF INVALIDATING THE OTHER 95 CLAIMS THAT MAY OR MAY |
| 09:33AM | 11 | NOT BE AT ISSUE IN THIS CASE. |
| 09:33AM | 12 | WE HAVEN'T GOTTEN TO THAT POINT IN THIS CASE YET WHERE THE |
| 09:33AM | 13 | PLAINTIFF ACTUALLY SUBMITS ITS PRELIMINARY INFRINGEMENT |
| 09:33AM | 14 | CONTENTIONS. |
| 09:33AM | 15 | THE COURT:  SO I SHOULD JUST RULE ON THE 5 AND LEAVE |
| 09:33AM | 16 | THE OTHER 95 FOR LATER LITIGATION? |
| 09:33AM | 17 | MR. MCANDREWS:  I THINK IF YOU DO THAT, YOUR HONOR, |
| 09:33AM | 18 | THE DIFFICULTY AGAIN COMES BACK TO THE NOTION OF JUDICIAL |
| 09:33AM | 19 | ECONOMY. |
| 09:33AM | 20 | ON JUNE 28TH, THE SUPREME COURT OF THE UNITED STATES |
| 09:33AM | 21 | EXPRESSLY OVERRULED THE SOLE BASIS ON WHICH JUDGE ARMSTRONG |
| 09:33AM | 22 | PREMISED HER INVALIDATION OF THE 5 CLAIMS IN THAT SUIT. |
| 09:34AM | 23 | THE COURT:  "EXPRESSLY" MEANING THEY REVERSED HER. |
| 09:34AM | 24 | MR. MCANDREWS:  THEY DIDN'T REVERSE HER.  SHE RELIED |
| 09:34AM | 25 | SOLELY ON WHAT IS CALLED THE MACHINE OR TRANSFORMATION TEST. |

09:34AM  1     COULD I HAND A COPY OF HER ORDER UP?

09:34AM  2           THE COURT:  I HAVE IT.

09:34AM  3           MR. ANDREWS:  OKAY.  YOU'VE GOT HER ORDER.

09:34AM  4     I THINK JUST FOR THE RECORD VERY CLEARLY THAT IS THE ONLY

09:34AM  5     TEST APPLIED BY JUDGE ARMSTRONG.

09:34AM  6      PAGE 8, "FOR THESE REASONS," AND I'M QUOTING, "THE CLAIMS

09:34AM  7     OF THE '047 AND THE '679 PATENT FAIL TO PASS MUSTER UNDER THE

09:34AM  8     BILSKI MACHINE IMPLEMENTATION TEST OF PATENTABILITY UNDER 35

09:34AM  9     U.S.C. 101."

09:34AM 10     I TALKED EARLIER ABOUT THE STATE OF FLUX.  WELL, THAT

09:34AM 11     MACHINE OR TRANSFORMATION TEST IS WHAT HAS BEEN AT ISSUE SINCE

09:34AM 12     THE DEFINITIVE RULING BY THE FEDERAL CIRCUIT WAS ON APPEAL TO

09:34AM 13     THE SUPREME COURT.

09:34AM 14     THE SUPREME COURT HAS SINCE OVERRULED THAT IN ITS

09:35AM 15     DECEMBER -- I'M SORRY -- IT'S JUNE 28TH DECISION.

09:35AM 16     THE CITATION IS BILSKI VERSUS KAPPOS.  THAT'S K-A-P-P-O-S,

09:35AM 17     130 SUPREME COURT 3218.  AND YOU DON'T HAVE TO LOOK FARTHER

09:35AM 18     THAN THE FIRST HEADNOTE TO FIND THE EXPRESSED REJECTION OF THE

09:35AM 19     MACHINE OR TRANSFORMATION TEST AS THE SOLE BASIS FOR REJECTING

09:35AM 20     THE CLAIM UNDER SECTION 101 OF THE PATENT ACT.

09:35AM 21          THE COURT:  I'M GLAD YOU EMPHASIZED THE SOLE BASIS.

09:35AM 22     THAT WAS THE LIMITATION, WASN'T IT?

09:35AM 23          MR. ANDREWS:  YOU MEAN THE LIMITATION OF THE SUPREME

09:35AM 24     COURT'S OPINION?  IT WAS, BUT UNFORTUNATELY IN THIS CASE, OR

09:35AM 25     FORTUNATELY FOR THE PLAINTIFF, IT WAS THE ONLY TEST APPLIED BY

09:35AM 1    JUDGE ARMSTRONG.

09:35AM 2        SO IT LEAVES US WITH THIS POSSIBILITY:  WE CAN PROCEED IN

09:35AM 3    THIS CASE AS TO ANY OF THE OTHER 95 CLAIMS TO WHICH JUDGE

09:35AM 4    ARMSTRONG'S OPINION DID NOT REACH, BUT I SENSE A BIT OF A

09:36AM 5    PIECEMEAL APPROACH IF WE DO THAT.

09:36AM 6        BECAUSE ON A PARALLEL TRACK, AS OF THIS PAST THURSDAY, THE

09:36AM 7    FEDERAL CIRCUIT LIFTED ITS STAY OF OUR APPEAL IN THE 3D LAB'S

09:36AM 8    CASE, JUDGE ARMSTRONG'S CASE.

09:36AM 9        IF THOSE CLAIMS -- IF THE FEDERAL CIRCUIT LATER REVERSES

09:36AM 10   BASED ON BILSKI GROUNDS, WE'RE THEN GOING TO HAVE TO BE BACK

09:36AM 11   POTENTIALLY BEFORE YOUR HONOR WITH THE FIVE CLAIMS THAT WERE

09:36AM 12   INITIALLY ASSERTED BEFORE JUDGE ARMSTRONG.

09:36AM 13       THE COURT:  CHARACTERIZE 5 AS OPPOSED TO THE 90 FOR

09:36AM 14   ME.  ARE THERE 5 INDEPENDENT CLAIMS AND ALL 5 INDEPENDENT

09:36AM 15   CLAIMS WERE INVALIDATED OR IS THERE SOME DISTINCTION BETWEEN

09:36AM 16   THE 5 AND THE 90?  DOES THAT MAKE SENSE?

09:36AM 17       MR. ANDREWS:  THERE ARE NOT.  AND IF THAT HAD BEEN

09:36AM 18   THE CASE, I THINK THE ANALYSIS MIGHT HAVE BEEN A LITTLE BIT

09:36AM 19   DIFFERENT, ALTHOUGH EACH AND EVERY PATENT CLAIMS LEGALLY STANDS

09:36AM 20   ON ITS OWN.  IT'S OWN ANIMAL IN TERMS THE LAW AND IN TERMS OF

09:36AM 21   VALIDITY IT STANDS ON ITS OWN.

09:37AM 22       I WENT THROUGH EXHIBITS A AND B TO DEFENDANT'S INSTANT

09:37AM 23   MOTION, JUDGE, AND TO ANSWER YOUR QUESTION, THERE ARE CLAIMS

09:37AM 24   THAT ARE FUNDAMENTALLY AND STRUCTURALLY DIFFERENT EVEN FOR THE

09:37AM 25   PURPOSES OF THE MACHINE OR TRANSFORMATION TEST.

09:37AM  1      IN OTHER WORDS, THERE ARE CLAIMS THAT EVEN ACCEPTING FOR

09:37AM  2  THE MOMENT JUDGE ARMSTRONG'S ANALYSIS UNDER THE NOW REJECTED

09:37AM  3  MACHINE OR TRANSFORMATION TEST, I THINK THAT THERE ARE CLAIMS

09:37AM  4  THAT WOULD OTHERWISE PASS MUSTER, BUT, AGAIN, WE DON'T KNOW

09:37AM  5  BECAUSE SUBSTANTIVELY MY CLIENT DIDN'T HAVE AN OPPORTUNITY TO

09:37AM  6  ARGUE THOSE.

09:37AM  7      MY CLIENT DID NOT ARGUE THOSE, AND THE DEFENDANT 3D LABS

09:37AM  8  AND IN JUDGE ARMSTRONG'S CASE DIDN'T CHALLENGE THE VALIDITY OF

09:37AM  9  THE REMAINING CLAIMS.

09:37AM  10          THE COURT:  ALL OF THE REST OF YOUR CLAIMS ARE

09:37AM  11  METHOD CLAIMS?

09:37AM  12          MR. ANDREWS:  ALL OF THE CLAIMS ASSERTED IN THIS

09:37AM  13  CASE -- STRIKE THAT.

09:37AM  14      ALL OF THE CLAIMS, ALL OF THE 100 CLAIMS OF EACH OF THE

09:37AM  15  ASSERTED PATENTS IN THIS CASE, AND IT WAS THE SAME TWO PATENTS

09:37AM  16  IN THE 3D LABS CASE, ARE METHOD CLAIMS, YES.

09:38AM  17          THE COURT:  SO, MR. CHATTERGEE, WHY SHOULDN'T I

09:38AM  18  WAIT?  THAT'S WHAT I'M BEING ASKED TO DO.

09:38AM  19          MR. CHATTERGEE:  YOUR HONOR, IT'S BECAUSE WE DON'T

09:38AM  20  THINK WE SHOULD HAVE TO WAIT.  THEY SUED US IN A JURISDICTION

09:38AM  21  WHICH WAS DELAWARE WHEN THE SAME PATENT WAS ALREADY IN SUIT

09:38AM  22  HERE.

09:38AM  23      THEY THEN GOT THEIR CLAIMS INVALIDATED BEFORE JUDGE

09:38AM  24  ARMSTRONG.

09:38AM  25      WHEN THEY WERE ON THIS SIDE OF THE ISSUE, FUZZYSHARP

09:38AM  1   OPPOSED THE ENTRY OF A STAY.  WE DON'T WANT THIS CASE HANGING

09:38AM  2   OVER US IF WE DON'T HAVE TO.

09:38AM  3       THIS CASE SHOULD HAVE NEVER BEEN BROUGHT IN THE FIRST

09:38AM  4   INSTANCE BECAUSE THE 3D LABS CASE IS THE CASE THAT PROCEEDS.

09:38AM  5   IT'S THE ONES WHERE THE CLAIMS HAVE BEEN INVALIDATED AND WE

09:38AM  6   SHOULDN'T HAVE TO PROCEED WITH IT IF THE CLAIMS ARE INVALID.

09:38AM  7       NOW, HE RAISES TWO ISSUES.  I'M HAPPY TO DISCUSS THE

09:38AM  8   MERITS, ALTHOUGH IT WOULD HAVE BEEN NICE IF ALL OF THESE WOULD

09:38AM  9   HAVE BEEN IN THEIR OPPOSITION BRIEF.  I STILL THINK YOU SHOULD

09:38AM  10  TREAT THE MOTION AS UNOPPOSED AND ENTER AN ORDER IN OUR FAVOR

09:39AM  11  BUT IF YOU WOULD LIKE ME TO ADDRESS THE MERITS OF WHAT HE JUST

09:39AM  12  DESCRIBED, I'M HAPPY TO DO THAT.

09:39AM  13       THE COURT:  GIVE ME THE POSTCARD VERSION.

09:39AM  14       MR. CHATTERGEE:  HERE'S THE POSTCARD VERSION.  THE

09:39AM  15  FIRST ISSUE THAT MR. MCANDREWS RAISED IS THAT UNADJUDICATED

09:39AM  16  CLAIMS ARE NOT SUBJECT TO DEFENSE OF COLLATERAL ESTOPPEL.

09:39AM  17  THAT'S FUNDAMENTALLY WRONG.

09:39AM  18      IN OUR PAPERS WE CITED THE JERVIS WEBB CASE, A CASE FROM

09:39AM  19  1984, THAT SPECIFICALLY SAYS THAT THE ISSUE IS THE SAME, THE

09:39AM  20  UNADJUDICATED CLAIMS ARE ALSO INVALID.

09:39AM  21      AS RECENTLY AS 2008 IN THE COLLEGENET CASE, WHICH IS CITED

09:39AM  22  IN OUR PAPERS, THERE'S A DETAILED ANALYSIS OF HOW THAT APPLIES

09:39AM  23  IN CONTEXTS SUCH AS THAT.

09:39AM  24      SO THE FACT THAT THE CLAIMS WERE NOT SPECIFICALLY

09:39AM  25  ADJUDICATED BEFORE JUDGE ARMSTRONG IS IRRELEVANT.  THEY HAVE TO

09:39AM  1   COME IN AND EXPLAIN TO YOU WHY THESE SPECIFIC CLAIMS SOMEHOW

09:39AM  2   WOULD MEET A DIFFERENT -- COME TO A DIFFERENT CONCLUSION THAN,

09:39AM  3   THAN THE OTHER -- THAN THE CLAIMS THAT WERE FOUND TO BE

09:39AM  4   INVALID.

09:39AM  5       THE SECOND ISSUE IS THAT MR. MCANDREWS SAID THAT THE

09:40AM  6   BILSKI TEST FUNDAMENTALLY CHANGED THE LAW.  THAT IS ALSO

09:40AM  7   FUNDAMENTALLY INCORRECT.

09:40AM  8       HE SAID THAT THE SUPREME COURT OVERRULED IT.  THE SUPREME

09:40AM  9   COURT ACTUALLY DESCRIBED THE MACHINE OR TRANSFORMATION TEST AS

09:40AM  10  A USEFUL TEST BUT NOT AN EXHAUSTIVE ONE AND THEY AFFIRMED THE

09:40AM  11  FEDERAL CIRCUIT.

09:40AM  12      THERE HAVE BEEN TWO CASES THAT HAVE COME DOWN SINCE THE

09:40AM  13  BILSKI OPINION ISSUED.  ONE IS A DISTRICT COURT CASE, ULTRA

09:40AM  14  MARITAL VERSUS HULA 2010 WESTLAW 3360098.  AND THEN THE FEDERAL

09:40AM  15  CIRCUIT ISSUED AN OPINION KING PHARMACEUTICALS, 616 F.3D 1267,

09:40AM  16  BOTH OF WHICH SUGGEST THAT THE BILSKI OPINION DID NOT REFLECT A

09:40AM  17  MAJOR CHANGE IN THE LAW.

09:40AM  18      INSTEAD, ESPECIALLY DESCRIBED IN THE HULA CASE, THEY

09:40AM  19  DESCRIBE IN DETAIL HOW IT SAID IT WAS A NON-EXHAUSTIVE TEST BUT

09:40AM  20  IT DID NOT REFLECT A FUNDAMENTAL CHANGE IN THE LAW.

09:41AM  21          THE COURT:  BUT ISN'T IT GOING TO BE THE CASE LIKELY

09:41AM  22  THAT THE CIRCUIT WILL ASK JUDGE ARMSTRONG TO CONSIDER HER CASE

09:41AM  23  AGAIN UNDER THE NEW STANDARD, WHATEVER THAT STANDARD IS, AND

09:41AM  24  WHY WOULD I GO TO COLLATERAL ESTOPPEL WHICH HAS GOT TO BE THE

09:41AM  25  SAME ISSUE BECAUSE THAT COULD CHANGE THE ISSUE, COULDN'T IT?

09:41AM 1          MR. CHATTERGEE: YOUR HONOR, THE RIGHT ISSUE THERE

09:41AM 2   IS THAT THEY SHOULD DISMISS THEIR CASE IN THAT INSTANCE WITHOUT

09:41AM 3   PREJUDICE AND IF THERE IS A REVERSAL, THEN THEY CAN DECIDE

09:41AM 4   WHATEVER IT IS THEY WANT TO DO.

09:41AM 5          I WANT TO MAKE ONE OBSERVATION ABOUT YOUR POINT. THE

09:41AM 6   FEDERAL CIRCUIT HAS ISSUED OPINIONS ASKING FOR SUPPLEMENTAL

09:41AM 7   BRIEFING IN LIGHT OF BILSKI, THERE'S A RELATIVELY RECENT CASE

09:41AM 8   PROMETHEUS LABORATORIES VERSUS MAYO THAT HAS SPECIFICALLY DONE

09:41AM 9   THAT AND THE FEDERAL CIRCUIT HAS NOT DONE THAT AND THAT

09:41AM 10  INDICATES TO ME AT LEAST THAT THEY DON'T SEE A NEED TO HAVE

09:41AM 11  SUPPLEMENTAL ARGUMENT ON JUDGE ARMSTRONG'S RULING IN LIGHT OF

09:41AM 12  THE BILSKI SUPREME COURT OPINION.

09:42AM 13         THE COURT: WELL, I'LL HAVE TO STUDY THIS MORE.

09:42AM 14  THIS IS BROUGHT TO ME AS A MOTION TO DISMISS, WHICH GIVES IT A

09:42AM 15  CURIOUS PROCEDURAL FOOTING, AS OPPOSED TO A MOTION FOR SUMMARY

09:42AM 16  JUDGMENT ON THE GROUNDS OF ESTOPPEL AND PRECLUSION.

09:42AM 17         AND I AM SOMEWHAT CONCERNED ABOUT WHAT I THINK YOU

09:42AM 18  ACCURATELY DESCRIBED AS THE STATE OF FLUX IN THE LAW, BUT I

09:42AM 19  THINK THE FLUX HAS NOW SETTLED DOWN.

09:42AM 20         AND SO THE QUESTION BECOMES WHETHER OR NOT I COULD REGARD

09:42AM 21  JUDGE ARMSTRONG'S CASE AS SETTLED LAW.

09:42AM 22         THERE ARE OCCASIONS WHEN EVEN THOUGH THERE'S AN APPEAL

09:42AM 23  TAKEN, THE COURT WOULD REGARD IT AS SETTLED FOR PURPOSES OF

09:42AM 24  APPLYING THE DOCTRINES OF PRECLUSION.

09:42AM 25         THE FACT THAT THE SUPREME COURT HAS SPOKEN ON THIS IN THE

09:43AM  1      INTERIM THOUGH DOES GIVE THE COURT PAUSE.

09:43AM  2          SO LET ME STUDY THIS AND SEE WHETHER OR NOT I WISH TO HOLD

09:43AM  3      BACK ON THE MERITS.

09:43AM  4          IT DOES SEEM TO ME THAT YOUR FAILURE TO RESPOND SHOULD BE

09:43AM  5      GIVEN INDEPENDENT CONSIDERATION BY THE COURT.  WERE I TO IGNORE

09:43AM  6      IT, IT WOULD PUT THE COURT IN A POSITION WHERE PARTIES COULD

09:43AM  7      FAIL TO RESPOND, THE MOVING SIDE COULD COME TO COURT ASKING FOR

09:43AM  8      JUDGMENT, AND THEN SOMEONE SHOWS UP AND RESPONDS.

09:43AM  9          SO AT THE VERY LEAST IT INVITES A RULE 11 SANCTION FOR THE

09:43AM  10     TIME AND EFFORT TO GO THROUGH ALL OF THIS MOTION WITHOUT THERE

09:43AM  11     BEING CLEAR NOTICE THAT THERE IS AN OPPOSITION TO IT.

09:43AM  12         SO I WILL TAKE THE MATTER UNDER SUBMISSION.  IF I DECIDE

09:43AM  13     TO INVITE RULE 11 MOTIONS, I'LL DO SO.

09:43AM  14             MR. MCANDREWS:  JUDGE, IF I COULD VERY BRIEFLY, ON

09:43AM  15     THE ISSUE OF THE UNSETTLED LAW, I THINK YOUR HONOR HIT IT.  IT

09:44AM  16     IS TRUE THAT THE SUPREME COURT TO AN EXTENT REJECTED THE

09:44AM  17     MACHINE OR TRANSFORMATION TEST.  IT DID SO AS THE EXCLUSIVE

09:44AM  18     BASIS AND ANALYSIS.

09:44AM  19         AND IN THE CASE THAT I'M WORRIED ABOUT RIGHT NOW, THE 3D

09:44AM  20     LABS CASE, THAT WAS THE SOLE BASIS FOR JUDGE ARMSTRONG'S

09:44AM  21     OPINION.

09:44AM  22         YOU HAD MENTIONED A FEW MOMENTS AGO THE POSSIBILITY, AND

09:44AM  23     COUNSEL MENTIONED AS WELL, OF DISMISSING WITHOUT PREJUDICE.

09:44AM  24         I THINK THAT THAT MAKES SENSE.  IT'S SOMETHING THAT WE'RE

09:44AM  25     OPEN TO CONSIDERING, AS LONG AS IT'S UNDERSTOOD THAT AFTER THE

09:44AM  1   APPEAL RUNS ITS COURSE WITH THE FEDERAL CIRCUIT, WE WOULD

09:44AM  2   CERTAINLY HAVE LEAVE TO --

09:44AM  3        THE COURT:  THE ENTIRE CASE?

09:44AM  4        MR. MCANDREWS:  WHAT I WOULD PROPOSE WOULD BE

09:44AM  5   DISMISSAL WITHOUT PREJUDICE AS TO THE 5 CLAIMS THAT WERE

09:44AM  6   RESOLVED THROUGH FINAL JUDGMENT BEFORE JUDGE ARMSTRONG AND THEN

09:45AM  7   I WOULD THINK A STAY WOULD BE IN PLACE OR APPROPRIATE AS TO THE

09:45AM  8   REMAINING 95, THE 95 CLAIMS.

09:45AM  9        THE COURT:  THEY GRADE MY PAPERS BACK IN WASHINGTON

09:45AM 10   ON HOW FAST I MOVE THESE.  ARE YOU GOING TO DEFEND ME WHEN THEY

09:45AM 11   SEE THESE CASES PILING UP AND THEY SAY WHY AREN'T YOU MOVING

09:45AM 12   THEM?  I DON'T LIKE STAYS.

09:45AM 13      THAT'S A HELPFUL SUGGESTION ON THE PART OF THE PLAINTIFF

09:45AM 14   TO HAVE THE CASE DISMISSED.  I'M NOT SURE I WOULD DO IT HALFWAY

09:45AM 15   BECAUSE WHY WOULD YOU BE PREJUDICED.

09:45AM 16      IF IT TURNS AROUND, AND IT TURNS AROUND AND IT'S WITHOUT

09:45AM 17   PREJUDICE.

09:45AM 18        MR. ANDREWS:  YOU'RE THE JUDGE AND I'M LISTENING TO

09:45AM 19   YOUR HONOR.  LET'S DO IT THAT WAY?  IS THAT THE COURT'S

09:45AM 20   PREFERENCE?

09:45AM 21        THE COURT:  WELL, I SAID I'LL TAKE IT UNDER

09:45AM 22   SUBMISSION AND STUDY IT.  I DON'T HAVE A PREFERENCE IN THESE

09:45AM 23   MATTERS.

09:45AM 24        MR. MCANDREWS:  I THINK WE HAVE A COLLATERAL

09:46AM 25   ESTOPPEL ARGUMENT AS TO FIVE OF THE CLAIMS.  I DO NOT THINK WE

09:46AM  1    HAVE ONE AS TO THE REMAINING 95 BECAUSE THE SUPREME COURT HAS

09:46AM  2    REJECTED THAT TEST, AND I THINK AT A MINIMUM WHAT COUNSEL IS

09:46AM  3    PRESENTING IS A DE FACTO MOTION FOR SUMMARY JUDGMENT, NOT A

09:46AM  4    RULE 12(B)(6) MOTION TO DISMISS AS TO THOSE 95 CLAIMS.

09:46AM  5              THE COURT:  YOU SOUND LIKE ME.

09:46AM  6              MR. CHATTERGEE:  OKAY.  YOUR HONOR, FIRST OF ALL,

09:46AM  7    AGAIN, IT WOULD HAVE BEEN NICE IF THEY PUT ANY OF THESE THINGS

09:46AM  8    IN THEIR PAPERS.  BUT FOR DEFENSIVE COLLATERAL ESTOPPEL, THERE

09:46AM  9    HAS TO BE, IN ORDER FOR IT TO NOT APPLY, THE EXCEPTION HE'S

09:46AM  10   ARGUING, THERE HAS TO BE A CHANGE IN THE LAW UNDER THE MONTANA

09:46AM  11   VERSUS UNITED STATES COURT PRECEDENT.

09:46AM  12       BECAUSE THE FEDERAL CIRCUIT SAID THAT THE MACHINE OR

09:46AM  13   TRANSFORMATION TEST IS A USEFUL TOOL BUT NOT THE ONLY TOOL AND

09:46AM  14   THAT THE FOLLOWING DISTRICT COURT AND APPELLATE COURT DECISION

09:46AM  15   SO FAR THAT HAVE INTERPRETED IT HAS SAID THAT IT IS A USEFUL

09:46AM  16   AND IMPORTANT TOOL AND IS AN AVAILABLE TOOL, IT IS NOT A MAJOR

09:46AM  17   CHANGE IN THE LAW AND DEFENSIVE COLLATERAL ESTOPPEL CAN APPLY

09:47AM  18   TO THAT CONTEXT.

09:47AM  19        I JUST WANT TO MAKE THAT ONE POINT, YOUR HONOR.

09:47AM  20              THE COURT:  I UNDERSTAND THAT.  MR. DEBRUINE,

09:47AM  21   MS. CHENG, ANYTHING YOU WANT TO ADD TO THIS.

09:47AM  22              MR. DEBRUINE:  NOTHING FURTHER.

09:47AM  23              MS. CHENG:  NOTHING ON MY PART.

09:47AM  24              THE COURT:  VERY WELL.  IT WILL BE UNDER SUBMISSION.

09:47AM  25              MR. CHATTERGEE:  THANK YOU, YOUR HONOR.

1     (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7       I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076

17

18       DATED:  MARCH 19, 2013

19

20

21

22

23

24

25

# Exhibit J

James F. Valentine (SBN 149269)
JValentine@perkinscoie.com
James C. Pistorino (SBN 226496)
JPistorino@perkinscoie.com
Kenneth J. Halpern (SBN 187663)
KHalpern@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

Attorneys for Defendant and Counterclaim-Plaintiff
INTEL CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FUZZYSHARP TECHNOLOGIES INCORPORATED,<br><br>                                 Plaintiff,<br><br>          v.<br><br>INTEL CORPORATION,<br><br>                                 Defendant. | Case No. 12-cv-4413 YGR<br><br>**DATE:**     April 30, 2013<br>**TIME:**     2:00 P.M.<br>**DEPT:**     Courtroom 5 – 2nd Floor<br><br>Honorable Yvonne Gonzalez Rogers |

**DEFENDANT INTEL'S NOTICE OF MOTION AND MOTION FOR JUDGMENT
ON THE PLEADINGS DISMISSING FUZZYSHARP'S CLAIMS
FOR LACK OF PATENT-ELIGIBILITY**

1

# TABLE OF CONTENTS

2

Page

3

NOTICE OF MOTION ........................................................................................... 1

4

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

5

I.       INTRODUCTION ......................................................................................... 1

6
7

II.      THE '047 AND '679 PATENTS BROADLY CLAIM MATHEMATICAL
         ALGORITHMS FOR SKIPPING PART OF THE "VISIBILITY
         CALCULATIONS" ALREADY USED IN 3D GRAPHICS ............................. 3

8
9
10

III.     THIS COURT PREVIOUSLY HELD THE CLAIMS PATENT-INELIGIBLE,
         THE FEDERAL CIRCUIT AGREED, AND ALL POLICY CONSIDERATIONS
         SUPPORT COMPLETING THE SECTION 101 ANALYSIS OF THE CLAIMS .......... 6

11

IV.      THE CLAIMS REMAIN PATENT-INELIGIBLE UNDER THE STANDARDS
         THE SUPREME COURT ANNOUNCED IN *BILSKI* AND *MAYO* .............................. 10

12
13

         A.      *Mayo* Holds that a Claim Is Not Patentable If It Merely Limits an Abstract
                 Idea to a Field of Use or Merely Adds Conventional Post-Solution Activity ...... 10

14

         B.      The Claims at Issue Here Do Not Satisfy *Mayo's* Patent-Eligibility
                 Standards ...................................................................................................... 12

15
16

                 1.      The Claims Are Patent-Ineligible Because They Claim an Abstract
                         Idea and Add Only an Instruction to "Apply It" in a Field of Use .......... 12

17

                 2.      The Claims Are Also Patent-Ineligible Because They Add Only
                         Conventional Post-Solution Activity to the Abstract Formula ................. 16

18
19

                 3.      Nothing in the Claims Not Previously Considered by the Federal
                         Circuit Changes the Analysis .................................................................. 18

20

         C.      The Court Need Not Await Claim Construction Because the Claims Fail to
                 Satisfy *Mayo* Even Assuming that Fuzzysharp's Constructions Are Correct....... 19

21
22

V.       CONCLUSION ........................................................................................... 20

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**

*Bancorp Servs. LLC v. Sun Life Assurance Co. of Canada*,
  687 F.3d 1266 (Fed. Cir. 2012) ...................................................................... 8, 18, 20

*Bilski v. Kappos*,
  130 S. Ct. 3218 (2010) ....................................................................................... *passim*

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
  2013 WL 245026 (N.D. Cal., Jan. 22, 2013) ................................................. 8, 19, 20

*CyberFone Sys., LLC v. Cellco P'ship*,
  2012 WL 3528115 (D. Del., Aug. 16, 2012) ....................................................... 8, 20

*Cybersource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ............................................................................... 18

*Dealertrack, Inc. v. Huber*,
  657 F. Supp. 2d 1152 (C.D. Cal. 2009) ................................................................... 6

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ................................................................................ 7

*Diamond v. Diehr*,
  450 U.S. 175 (1981) .............................................................................. 10, 11, 12

*Dworkin v. Hustler Magazine, Inc.*,
  867 F.2d 1188 (9th Cir. 1989) .................................................................................. 7

*Eakin Enters., Inc. v. Specialty Sales LLC*,
  2012 WL 2445154 (E.D. Cal., Jun. 26, 2012) ........................................................ 8

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011) ................................................................................ 9

*Fuzzysharp Techs., Inc. v. 3D Labs, Inc.*,
  2009 WL 4899215 (N.D. Cal. 2009) ................................................................. *passim*

*Fuzzysharp Techs., Inc. v. 3D Labs, Inc.*,
  447 Fed. Appx. 182 (Fed. Cir. 2011) ............................................................... *passim*

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
  2011 WL 1870591 (D.N.J. May 16, 2011) ............................................................. 8

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) ................................................................................................. 11

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008)................................................................................. 6, 10

*Intri–Plex Techs., Inc. v. Crest Group, Inc.*,
    499 F.3d 1048 (9th Cir. 2007)............................................................................... 8

*Io Group, Inc. v. Veoh Networks, Inc.*,
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................ 8

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S. Ct. 1289 (2012).................................................................................*passim*

*Ohio Willow Wood Co. v. Thermo-Ply, Inc.*,
    629 F.3d 1374 (Fed. Cir. 2011)............................................................................ 9

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    2012 WL 3985118 (N.D. Cal., Sept. 11, 2012) ................................................ 8, 20

*Openwave Sys., Inc. v. Myriad France S.A.S.*,
    2011 WL 1832999 (N.D. Cal., May 13, 2011) ................................................ 7, 8

*Parallel Networks LLC v. Abercrombie & Fitch Co.*,
    704 F.3d 958 (Fed. Cir. 2013)............................................................................ 9

*Parker v. Flook*,
    437 U.S. 584 (1978).....................................................................................*passim*

*Roche Palo Alto LLC v. Apotex, Inc.*,
    526 F. Supp. 2d 985 (N.D. Cal. 2007) .................................................................. 8

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010)............................................................................ 7

*Stanley v. Trustees of Cal. State Univ.*,
    433 F.3d 1129 (9th Cir. 2006)............................................................................ 7

*Wildtangent, Inc. v. Ultramercial*,
    657 F. 3d 1323 (Fed. Cir. 2011),
    *cert. denied*, 12 S. Ct. 2431 (U.S. May 21, 2012)................................................ 20

**STATUTES**

35 U.S.C. § 101 ..................................................................................................... 1, 7, 20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 7, 20

Fed. R. Civ. P. 12(c) .............................................................................................. 1, 7, 20

# NOTICE OF MOTION

**TO:     THE COURT, ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE THAT on April 30, 2013, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5, 2nd Floor, 1301 Clay Street, Oakland, California 94612 before the Honorable Yvonne Gonzalez Rogers, Defendant and Counterclaim-Plaintiff Intel Corporation will, and hereby does, move the Court for an order dismissing this action with prejudice on the ground that the asserted claims of U.S. Patent No. 6,618,047 ("the '047 patent") (claims 1-6, 8-13, 15-17, 20, 21, 23-25, 27, 46, 47, 49, 51, 54, 55, 57-59, 61-65, and 67-68) and of U.S. Patent No. 6,172,679 ("the '679 patent") (claims 1, 4, and 5) (the "Asserted Claims") are not drawn to subject matter that is eligible for a patent.

This motion is made pursuant to Fed. R. Civ. P. 12(c) and 35 U.S.C. § 101 on the grounds that the Asserted Claims are not patent-eligible. As this Court and the Federal Circuit have already recognized, representative claims fail the "machine or transformation" test. Moreover, the Asserted Claims either claim an abstract idea and add nothing more than an instruction to "apply it," or recite an abstract idea without requiring any application containing an "inventive concept," or both.

The Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of James F. Valentine and exhibits thereto, any reply memorandum, the pleadings and files in this action, and such other matters as may be presented at or before the hearing.

Dated:  March 15, 2013                          By:  _____*/s/ Kenneth J. Halpern*_____
                                                          Kenneth J. Halpern

                                                     Attorneys for Defendant and
                                                     Counterclaim-Plaintiff
                                                     INTEL CORPORATION

-1-

DEFENDANT INTEL'S MOTION FOR JUDGMENT
ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Intel moves for judgment on the pleadings that the Asserted Claims of the '047 and '679 patents are invalid because they do not cover patent-eligible subject matter.  In Fuzzysharp's earlier lawsuit against 3D Labs, this Court held all of the claims asserted in that case to be unpatentably abstract under the then-prevailing "machine-or-transformation" test for patent-eligibility.  The Federal Circuit agreed with that analysis, but remanded for further consideration in light of the Supreme Court's decision in *Bilski v. Kappos*, 130 S. Ct. 3218 (2010).  Fuzzysharp took advantage of the remand and settled that case before the Court could complete the patent-eligibility analysis, but it has subsequently sued Intel and other defendants on claims that are plainly invalid.  This is consistent with its longstanding pattern of filing suit on these patents and settling quickly, as it has done on eight previous occasions.  Fuzzysharp's claims are directed to nothing more than a method for skipping steps in a calculation, but it has avoided having them invalidated by allowing its litigations to progress only so far.  With this motion on the pleadings, Intel seeks to prevent Fuzzysharp from proceeding with this suit, and others, based on invalid claims.

The abstractness of the claims is manifest.  The purported invention is a mathematical formula for choosing which steps to omit from computations already in use, plus a direction to omit those steps.  It claims no new machine, no particular application of its formula, nor even a new type of calculation—just a mathematical principle for cutting out part of well-known computations.  That is why this Court held Fuzzysharp's claims patent-ineligible as drawn to "mathematical calculations and algorithms" with token computer elements that are not meaningfully limiting.  *Fuzzysharp Techs., Inc. v. 3D Labs, Inc.*, No. 07-cv-5948, 2009 WL 4899215, *5 & n.3 (N.D. Cal. 2009), *vacated*, 447 Fed. Appx. 182 (Fed. Cir. 2011) ("*3D Labs*").  The Court specifically recognized that the claims were "not tailored narrowly enough to encompass only a particular application of a fundamental principle rather than to pre-empt the principle itself," which is the policy concern at the heart of Section 101 of the Patent Act.  2009 WL 4899215, at *3.  The Federal Circuit agreed, 447 Fed. Appx. at 184-85, but remanded

DEFENDANT INTEL'S MOTION FOR JUDGMENT
ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

because in the interim, the Supreme Court declared in *Bilski* that the "machine or transformation" test is not the "sole test" for patent-eligibility even though it is "a useful and important clue" that is reliable in most cases. 130 S. Ct. at 3230-31 (2010). *Bilski* does not change the result here, however. Indeed, in a later case, *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court unanimously announced standards that reinforce the correctness of this Court's ruling that Fuzzysharp's claims are invalid under Section 101.

Under *Mayo*, a claim must still be drawn to a "***particular application***" of an abstract idea or law of nature. *Id.* at 1299, 1302 (emphasis added). A claim does not meet this standard if it simply recites an abstract idea or law of nature along with an instruction to apply it in a particular field of use. *Id.* at 1297. The only application language in Fuzzysharp's claims is exactly that sort of instruction—a statement in the preamble that the "calculations" are performed in a field of use such as "3-D graphics" or "the production of a multi-dimensional image." Otherwise, the patents claim the formula at the level of pure mathematics. This does not satisfy *Mayo*.

Under *Mayo*, a claim is also unpatentable if, "putting the [abstract] formula to the side, there [is] no 'inventive concept' in the claimed application of the formula," as when it adds only "conventional or obvious" "post-solution activity." *Id.* at 1299 (citing *Parker v. Flook*, 437 U.S. 584, 589, 590 (1978)). After solution of the formula, Fuzzysharp's claims recite only steps that would be performed even without the formula. *Mayo* identified a similar claim, drawn to a mathematical algorithm in an otherwise unchanged process, as the paradigm case of no "'inventive concept.'" *Id.* at 1299 (citing *Flook*, 437 U.S. at 594).

Failing either *Mayo* standard means the claims "too broadly preempt the use of" the abstract principles that are the basic tools of scientific and technological work. *Id.* at 1294, 1301. The Asserted Claims fail both standards. Moreover, because patent-eligibility is an issue of law, the Court can decide this issue based on the pleadings and material subject to judicial notice, such as the patents-in-suit and Fuzzysharp's previous proposed constructions. The prior ineligibility finding by this Court, endorsed by the Federal Circuit, means that most of the Court's work is already done. While Fuzzysharp was able to settle the *3D Labs* case and postpone its day of reckoning, there is no reason to further defer the application of *Mayo* to these claims. Doing so

1   now will eliminate costly and unnecessary disclosures and discovery, and stop Fuzzysharp from

2   pursuing new cases based on the same claims.  Indeed, district courts around the country have not

3   hesitated to apply *Mayo* to invalidate claims like the ones at issue here.  Accordingly, Intel

4   requests that the Court dismiss Fuzzysharp's complaint with prejudice.

5   **II.    THE '047 AND '679 PATENTS BROADLY CLAIM MATHEMATICAL**

6   **ALGORITHMS FOR SKIPPING PART OF THE "VISIBILITY CALCULATIONS" ALREADY USED IN 3D GRAPHICS**

7          The Asserted Claims are drawn to nothing more than identifying the portions of known

8   computations that may be omitted, omitting them, and carrying out the remaining computations as

9   before.  As this Court and the Federal Circuit have already found with respect to the claims

10  Fuzzysharp previously asserted (including these), they are drawn to no new machine and no

11  specific application of their formula.  The patents describe the invention as "an improved method

12  for performing visibility calculations" in three-dimensional graphics.  (Ex. 1 ('047 patent), col.

13  2:23-24; Ex. 2 ('679 patent), col. 2:19-20; patent Titles.)[1]  Visibility calculations are well known:

14  they are used for "visible surface detection," which is "one of the most basic operations" in 3D

15  graphics.  (Ex. 1, col. 1:18-21; Ex. 2, col. 1:16-18.)  The calculations determine whether a 3D

16  surface can be seen from different vantage points, making it easier to represent the surface in two

17  dimensions.  (Ex. 1, col. 1:13-20.)

18         According to the patents, prior-art visibility calculations were slow because they required

19  analysis of every element of the surface in detail.  (Ex. 1, col. 1:23-40; Ex. 2, col. 1:21-38.)  The

20  claimed methods shorten the calculations by identifying part of the surface that is either always

21  visible or always invisible from a set of viewpoints and then skipping the calculations for that

22  part.  Claim 1 of the '047 patent is representative:

23

24

25

26

27

28         [1] Exhibits are attached to the accompanying Declaration of James F. Valentine.

-3-

| '047 patent, Claim 1 |
|---|
| **_Preamble:_** |
| A method of **reducing the visibility related computations in 3-D computer graphics**, the visibility related computations being performed on 3-D surfaces or their sub-elements, or a selected set of both, the method comprising: |
| **_Method steps:_** |
| **identifying** grid cells which arc under or related to the projections or extents of projections associated with at least one of said 3-D surfaces or their sub-elements; |
| **comparing data** associated with said at least one of 3-D surfaces or their sub-elements with **stored data** associated with the grid cells; |
| **determining** which of said at least one of 3-D surfaces or their sub-elements is always invisible or always visible to a viewpoint or a group of viewpoints **by projection based computations prior to a visibility computation**; and |
| **ignoring** said determined at least one of the 3-D surfaces or their sub-elements **during said visibility computation.** |

All the challenged claims have the same format as claim 1:  a preamble that states that the method is for **(1) "reducing" (2) "the visibility related computations"** or **"the visibility calculations"** (or a variant) **(3) in a certain field of use** (such as "3-D computer graphics"), followed by method steps to perform the reduction.  The method steps have three components: **(4) mathematical manipulations of data**, such as "identifying," "comparing," or "determining," **(5) a mathematical reducing step**—"ignoring" or "exempting" or "skipping" data or calculations, and **(6) an indication of where these steps fit into the visibility computations**. Finally, there are a few references to **(7) generic computing structures (e.g., "data," a "record," or a "computer")**.[2]

---

[2] To make it easier for the reader to identify the different types of claim components, we have used **red, blue** or **purple** for the mathematical limitations (**red for the reducing step, blue for the visibility computations the method reduces**, and **purple for the other math steps**), along with **green for the field of use recitation**, and **gold for generic computer elements.**

Boiling the claim down to simple terms, it describes the following procedure:

**Before carrying out visibility-related computations,**

**identify at least one part of a surface in a 3-dimensional scene that is always visible from a given set of vantage points or always invisible,**[3]

and then **ignore that part of the surface**

**during the visibility computations.**

The abstract character of the method is plain. The claim covers "computations" done by "identifying" and "comparing" "data" representing geometric forms such as "grid cells" and "projections" of "3-D surfaces." Neither the claim nor the specification recites any physical instantiation of these geometric concepts. On the contrary, the patent makes clear that they are mathematical entities. For example, the method "determin[es]" which part of a surface is always invisible or always visible from a claimed "viewpoint" yet the patent teaches that the viewer "is an abstract and dimensionless observer." (Ex. 1, col. 4:14-17; Ex. 2, col. 4:44-37.) In the preferred embodiment "for calculating three dimensional *computer* graphic images," the specification teaches that "[t]he spatial position, time and the optical properties described in this embodiment can be replaced by other physical *or abstract* variables if the replacement does not affect *the mathematical relationship of entities* in the graphic image." (Ex. 1, col. 3:64-65, 4:6-11) (emphasis added); Ex. 1, col. 18:46-48; Ex. 2, col. 19:5-7.) Thus, any equations having the same "mathematical relationship of entities" fall within the invention regardless of the physical properties or variables to which they are applied.[4]

---

[3] The '679 claims additionally require identifying the surfaces that are neither always visible nor always invisible and maintaining a record of these remaining surfaces.

[4] Fuzzysharp's proposed constructions in previous cases are to the same effect. For example, Fuzzysharp defined the claimed "grid cells," in relevant part, as "an elementary closed region on a mathematical plane," and "projection based computations" as, in relevant part, "mathematical operations." Ex. 3, Ex. A, at 2, 3.

1    **III.    THIS COURT PREVIOUSLY HELD THE CLAIMS PATENT-INELIGIBLE, THE**
         **FEDERAL CIRCUIT AGREED, AND ALL POLICY CONSIDERATIONS**
2        **SUPPORT COMPLETING THE SECTION 101 ANALYSIS OF THE CLAIMS**

3            When this Court heard a previous challenge to the patentability of the subject matter of

4    these patents, it held that claims 1 and 12 of the '047 patent and claims 1, 4, and 5 of the '679

5    patent (the only claims asserted) were unpatentably abstract.  It reached this conclusion based on

6    the "machine or transformation" test the Federal Circuit had adopted in *In re Bilski*, 545 F.3d 943,

7    954 (Fed. Cir. 2008) (*en banc*), *aff'd on other grounds sub nom. Bilski v. Kappos*, 130 S. Ct. 3218

8    (2010), *Fuzzysharp Techs., Inc. v. 3D Labs, Inc.*, 2009 WL 4899215, at *5 (N.D. Cal. Dec. 11,

9    2009).  The machine-or-transformation test requires a claimed process to be "(1) … tied to *a*

10   *particular machine* or apparatus, or (2) … *transform[ ]* a particular article into a different state or

11   thing."  *Id.* at *3.  Fuzzysharp conceded that the claims involved no physical transformation and

12   instead contended that they recited a machine.  *Id.* at *4.  But the test requires more than "a

13   general[ ] reference to 'a' computer."  *Id.*  The claim must contain elements tying the invention

14   "to a particular machine."  *Id.* at 3.  Failing this standard signifies that a claim is not "tailored

15   narrowly enough to encompass only a particular application of a fundamental principle rather

16   than to pre-empt the principle itself."  *Id.* (quoting *Bilski*, 545 F.3d at 954 (Fed. Cir. 2008)).

17           This Court found it decisive that the claimed sequence of "'identifying,' 'comparing,'

18   'determining,' and 'ignoring' data" "may be" performed on a computer but does not require "any

19   *particular* computer."  *Id.* at *4 (citing *Dealertrack, Inc. v. Huber*, 657 F. Supp. 2d 1152, 1155-56

20   (C.D. Cal. 2009) (holding claim ineligible where it did not specify "precisely how the computer

21   hardware and database are 'specially programmed,'" nor "the claimed central processor"), *aff'd*

22   *as to this holding*, 674 F.3d 1315, 1331-32 (Fed. Cir. 2012)).  Nor did such elements as a "method

23   of reducing the [ ]visibility related computations in 3-D graphics," "computer storage," "using a

24   data structure in a computer," and "projecting 3D images 'on a computer screen'" limit the claims

25   "to any *particular* machine."  *3D Labs*, 2009 WL 4899215 at *4, *5.  The computer did not

26   "impose any meaningful limit on the claim scope" because it merely "serve[d] to perform the

27   computation."  *Id.* at *5 n.3.  As a result, the Court held, "these claims are drawn to mathematical

28   calculations and algorithms."  *Id.* at *5.

-6-

On appeal, the Federal Circuit declared that this Court "properly held that all of the asserted claims fail the machine-or-transformation test" and specifically "agree[d] with the [C]ourt's analysis of that issue." *3D Labs*, 447 Fed. Appx. at 184. It echoed this Court's conclusion that "[t]he recitation of computer functions in the claim … [did] not confine the preemptive effect of the claim." *Id.* at 185. Nevertheless, because of the Supreme Court's subsequent announcement in *Bilski* that the machine-or-transformation test was no longer the sole test of patent-eligibility, the Federal Circuit vacated and remanded for this Court to apply *Bilski* and other recent precedents to Fuzzysharp's claims. *Id.* at 186. Those authorities and the Supreme Court's more recent decision in *Mayo* do not alter the finding of ineligibility, indeed they confirm it. The *3D Labs* case settled, but this Court may proceed where the Federal Circuit left off and complete the patentable subject-matter inquiry as to the '047 and '679 claims.

The Court may decide the issue on the pleadings because patent-eligibility is an issue of law for the Court and all relevant facts either appear on the face of the pleadings or are subject to judicial notice. Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Because a motion for judgment on the pleadings is "functionally identical" to a motion to dismiss, the standard on a Rule 12(c) motion is essentially the same as on a Rule 12(b)(6) motion. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Under that standard, the complaint must allege sufficient facts to support a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). "Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006).

Whether the claims satisfy 35 U.S.C. § 101's criteria for patent-eligible subject matter is a question of law for the Court. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012). Here, the only material outside the pleadings the Court need consider are the patents-in-suit, Fuzzysharp's claim construction proposals in the *3D Labs* case, and certain general technological terms, of which it may take judicial notice. *See Openwave Sys., Inc. v. Myriad France S.A.S.*,

-7-

No. 10-cv-2805, 2011 WL 1832999 at *4 (N.D. Cal., May 13, 2011) (on summary judgment motion, taking judicial notice of patents as "matters of public record"); *Eakin Enters., Inc. v. Specialty Sales LLC*, No. 11-cv-2008, 2012 WL 2445154 (E.D. Cal., Jun. 26, 2012) (court may take judicial notice of its own records from other cases and may consider them in ruling on a Rule 12(b)(6) motion) (citing *Intri–Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)); *see also Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 993 (N.D. Cal. 2007) (taking judicial notice of claim construction ruling from a prior case); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1145 n.8 (N.D. Cal. 2008) (taking judicial notice of Wikipedia definition of "IP address" as "not a matter that is subject to reasonable dispute.").

As the Federal Circuit recognized in the *3DLabs* case, it is appropriate to accept Fuzzysharp's constructions for purposes of the Section 101 analysis.  447 Fed. Appx. at 184 (noting that this Court used agreed constructions and, for disputed terms, Fuzzysharp's constructions); *Bancorp Servs. LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("claim construction is not an inviolable prerequisite to a validity determination under section 101").  Determining subject-matter eligibility on the pleadings is also a common and accepted practice.  *See Cardpool, Inc. v. Plastic Jungle, Inc.*, No. 12-cv-4182, 2013 WL 245026, *1-*3 (N.D. Cal. Jan. 22, 2013) (granting motion to dismiss under Rule 12(b)(6) for lack of statutory subject matter under *Mayo*, without waiting for claim construction); *OIP Techs., Inc. v. Amazon.com, Inc.*, No. 12-cv-1233, 2012 WL 3985118, *5, 12, 16-20 (N.D. Cal. Sept. 11, 2012) (same); *CyberFone Sys., LLC v. Cellco P'ship*, No. 11-cv-827, 829, 831, 2012 WL 3528115, at *4, 5-6 (D. Del. Aug. 16, 2012) (same); *Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 09-cv-4252, 2011 WL 1870591, *1-4 (D.N.J. May 16, 2011) (same, pre-*Mayo*).

Intel particularly urges the Court to decide the issue now in light of Fuzzysharp's longstanding practice of filing cases and quickly settling them to preserve its patents for the next target.  As far as Intel can determine, Fuzzysharp is a non-practicing entity that, on eight previous occasions, has filed actions in this Court and settled before claim construction could occur, with

-8-

DEFENDANT INTEL'S MOTION FOR JUDGMENT ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

1   each case lasting an average of 9 months from filing to stipulated dismissal.[5]  Each action was

2   filed on or shortly after settlement of the prior suit, presumably to foreclose the possibility of a

3   joint defense.  The Federal Circuit has recognized this as a pattern in litigation that intentionally

4   exploits the high cost of defending patent suits.  *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d

5   1314, 1327 (Fed. Cir. 2011) (bad faith supporting sanctions shown by multitude of lawsuits

6   settled quickly for settlement offers far below the cost of defense to "ensure[] that [plaintiff's]

7   baseless infringement allegations remained unexposed"); *Ohio Willow Wood Co. v. Thermo-Ply,*

8   *Inc.*, 629 F.3d 1374, 1376-77 (Fed. Cir. 2011) ("the costs of patent litigation are enormous with

9   an average patent case costing upwards of $3 million for each side").  Indeed, in response to a

10  strategy of "trying to extract an early settlement from as many defendants as possible," the

11  Federal Circuit recently approved a "creative procedure designed to streamline the case" by

12  holding an early *Markman* hearing to construe three terms that would be case-dispositive.

13  *Parallel Networks LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 965 (Fed. Cir. 2013).

14          Here, Intel seeks no departure from normal procedure.  It asks only that the Court decide

15  this properly filed motion on the pleadings.  The timing of the *Bilski* decision was fortuitous for

16  Fuzzysharp — it prompted a remand that enabled Fuzzysharp to settle and avoid an ultimate

17  determination of patent eligibility in the only case that proceeded far enough for a court to subject

18  its claims to scrutiny.  As this Court and the Federal Circuit have already laid the groundwork in

19  *3D Labs*, there is no reason not to perform the last step of the analysis.  Completing the

20  application of Section 101 to Fuzzysharp's patents in the context of this motion on the pleadings

21

22

23          [5] This average duration omits the *3D Labs* case, which went up on appeal.  Notably,
    however, *3D Labs* also did not produce a claim construction order.  The other cases were against
24  Hewlett Packard Co. (No. 01-cv-4915, filed Dec. 14, 2001, dismissed Oct. 22, 2002), Silicon
    Graphics, Inc. (No. 03-cv-4404, filed Sept. 30, 2003, dismissed June 2, 2004), I-0 Data Center
25  USA, Inc. (No. 04-cv-2640, filed June 30, 2004, dismissed Jan. 10, 2005), ATI Techs., Inc. (No.
    05-cv-1318, filed March 31, 2005, dismissed July 25, 2006), S3 Graphics Co., Ltd. (No. 07-cv-
26  2262, filed Apr. 25, 2007, dismissed Dec. 18, 2007), Sun Microsystems, Inc. (No. 08-cv-4284,
    filed Sept. 11, 2008, dismissed May 27, 2009), and Nvidia Corp. (No. 10-cv-1844, filed April 30,
27  2010, dismissed Nov. 4, 2010).  Moreover, Fuzzysharp has filed additional suits in this Court
    since suing Intel, abandoning its previous strategy of avoiding overlapping litigation.  Presumably
28  this is because the patents in suit have expired, and its damages window is closing.

DEFENDANT INTEL'S MOTION FOR JUDGMENT
ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

will likely save judicial and party resources that would otherwise be spent on litigating invalid claims in this case and the other new cases Fuzzysharp has recently filed in this Court.

## IV. THE CLAIMS REMAIN PATENT-INELIGIBLE UNDER THE STANDARDS THE SUPREME COURT ANNOUNCED IN *BILSKI* AND *MAYO*

### A. *Mayo* Holds that a Claim Is Not Patentable If It Merely Limits an Abstract Idea to a Field of Use or Merely Adds Conventional Post-Solution Activity

The fact that the claims have already failed the "machine-or-transformation" test strongly suggests they "pre-empt [a] principle" and are not statutory subject matter. *In re Bilski*, 545 F.3d at 954; *see 3D Labs*, 447 Fed. Appx. at 185 (recited computer functions "do[] not confine the preemptive effect of the claim"). In its *Bilski* decision, the Supreme Court, far from discarding the machine-or-transformation test, declared it "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under section 101," albeit not the "sole test." 130 S. Ct. at 3227. Justice Stevens and three other Justices noted in a concurrence that "the entire Court agrees that … the machine-or-transformation test is reliable in most cases." *Id.* at 3232. The Supreme Court supplemented the machine-or-transformation test by reviewing its own precedents involving computer-implemented claims, but its analysis confirms the Federal Circuit's conclusion under that test that the claims are not patent-eligible.

*Bilski* reiterated the long-recognized postulate that "laws of nature, physical phenomena, and abstract ideas" are "part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none." 130 S. Ct. at 3225 (citations omitted). Although the Court did not provide an explicit definition of abstractness, it cautioned that the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Id.* at 3230 (quoting *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)). By contrast, it observed, "'an *application* of a law of nature or mathematical formula to a known structure or process'" may be entitled to a patent, but only if the claim as a whole is "not 'an attempt to patent a mathematical formula.'" *Id.* at 3230 (quoting *Diehr*, 450 U.S. at 187).

In its subsequent, and unanimous, decision in *Mayo*, the Supreme Court reinforced these principles and announced standards for lower courts to apply. The Court declared that a claim "must do more than simply state" an abstract idea and an instruction to "apply it" in a field of use. 132 S. Ct. at 1294, 1301.[6] That is because such claims "too broadly preempt the use of a natural law" and "foreclose more future invention than the underlying discovery could reasonably justify." *Id. Mayo* illustrated the point by elaborating on *Gottschalk v. Benson*, 409 U.S. 63 (1972), where the claims were directed to "a method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form." *Id*. at 65. Although the claims recited seemingly specific computing components, such as a "reentrant shift register," *id.* at 73-74, the Court concluded they would cover any use of the method in a computer. *Id.* at 64 (reaffirmed in *Mayo*, 132 U.S. at 1301). Because the formula had "no substantial application except in connection with a digital computer" the claims would encompass all applications of the algorithm and effectively preempt it. *Mayo*, 132 S. Ct. at 1301 (citing *Benson*, 409 U.S. at 71). In *Mayo*, the Court recognized that a claim need not cover *all* potential uses to be ineligible, but only "*disproportionately* t[ie] up the use of the underlying abstract ideas or natural laws, inhibiting their use in the making of further discoveries." 132 S. Ct. at 1294 (emphasis added). Even restriction to a single field of use cannot make an abstract idea patentable. *Id.* at 1301. The key is that a claim must do more than just state a technological context or a use: it must "add *enough*" to the law of nature or abstract idea to limit it to a patent-eligible application. *Id.* at 1297.

*Mayo* also articulated a second proposition to guide patent-eligibility analysis: a claim must apply the abstract idea in a way that reflects an "inventive concept." The Supreme Court illustrated this proposition by distinguishing its decisions in *Parker v. Flook*, *supra*, and *Diamond v. Diehr, supra*. In *Flook*, the claimed method used a computer to calculate alarm-limit values to signal dangers in operating a catalytic converter, but the process did "nothing other than

---

[6] *Mayo* involved the parallel "law of nature" exception to patent-eligibility, but the Supreme Court treats "laws of nature, natural phenomena, [and] abstract ideas," including mathematical algorithms, interchangeably. 132 S. Ct at 1293.

DEFENDANT INTEL'S MOTION FOR JUDGMENT ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

1   'provid[e] an unpatentable formula for computing [the] updated alarm limit." *Mayo*, 132 S. Ct. at

2   1299; (quoting *Flook*, 437 U.S. at 586) (internal quotations and brackets omitted).  All the other

3   steps—the chemical processes involved in catalytic conversion, the monitoring of chemical

4   process variables, the use of alarm limits to signal danger, and the adjusting of those limits

5   through the use of computers for "automatic monitoring-alarming"—were "'well known.'"  *Id.* at

6   1299 (quoting *Flook*, 437 U.S. at 594).  Thus, "putting the [abstract] formula to the side, there

7   was no 'inventive concept' in the claimed application of the formula."  *Id.*  In *Diehr*, by contrast,

8   the "other steps" added something "that transformed the process into an inventive application of

9   the formula."  *Mayo*, 132 S Ct. at 1299 (observing that claim incorporating the computer solution

10  of the well-known Arrhenius equation in a rubber-curing process was patentable because the

11  other steps, and the combination of them, were not "obvious, already in use, or purely

12  conventional").

13      *Mayo* thus teaches that "purely 'conventional or obvious' activity" after the solution of a

14  mathematical formula is also not a specific application that "'can transform an unpatentable

15  principle into a patentable process.'"  *Id.* (quoting *Flook*) (brackets omitted).  Fuzzysharp's

16  claims fail both *Mayo* standards.

   **B.      The Claims at Issue Here Do Not Satisfy *Mayo*'s Patent-Eligibility Standards**

17

18          **1.      The Claims Are Patent-Ineligible Because They Claim an Abstract
                       Idea and Add Only an Instruction to "Apply It" in a Field of Use**

19

20      *Mayo* confirms the Federal Circuit's conclusion under the machine-or-transformation test

21  that the claims here lack "meaningful limits" to a specific application.  *3D Labs*, 447 Fed. Appx.

22  at 186.  They recite only calculations, and specify at most a field of use in which their

23  mathematical algorithms are applied.  This constitutes nothing more than an instruction to "apply

24  the law."  *Mayo*, 132 S. Ct. at 1301.  Consequently, the claims are drawn to an entire identified

25  field of practical applications for the algorithm, rendering them improperly preemptive.  *Mayo*,

26  132 S. Ct. at 1301.

27      The '047 claims have only one element that even arguably limits them to an application:

28  the preamble's field-of-use recitation that the visibility computations are "in 3-D computer

-12-

1    graphics." (Ex. 1, claim 1). As noted above, this Court found that the method steps such as

2    "identifying," "comparing," "determining" and "ignoring" data "specify a sequence of

3    calculations," while the claims as a whole are "drawn to mathematical calculations and

4    algorithms." *3D Labs*, 2009 WL 4899215 at *5. The Federal Circuit "agree[d] with the [C]ourt's

5    analysis." 447 Fed. Appx. at 184. Moreover, Fuzzysharp's construction confirms that the

6    "visibility related computations" the method acts on are "mathematical or algorithmic operations

7    that are used for computing the visibility of one or more surfaces." (Ex. 3, Ex. A at 2.)

8            The claims thus reduce to:

9                    Apply a series of calculations

10                   to a set of mathematical visibility computations

11                   "in 3-D computer graphics."

12   Apart from non-limiting generic structures (e.g., "stored data"), *3D Labs*, 2009 WL 4899215, at

13   *4, 5 n.3, 447 Fed. Appx. at 185, the phrase "in 3-D computer graphics" is the only matter that

14   gives the claim any technological context at all.[7]

15           The patents teach that "in 3-D computer graphics" is not a specific application, but a

16   broad *field of use* in which the method may be applied. The patents identify the "Field of the

17   Invention" as "computer graphics and, in particular [efficient hidden surface removal], generally

18   in 3D systems." (Ex. 1, col. 1:11-16; Ex. 2, col. 1:8-13; Ex. 1 and 2 Abstract (the disclosed

19   method operates "in 3D graphics systems").) The visible surface detection to which the patents

20   pertain is "one of the most basic operations in 3D graphics." (Ex. 1, col. 1:18-21; Ex. 2, col.

21   1:16-18.) Before discussing the purported invention, the patent "introduce[s] various terms and

22   define[s] variables used in 3D graphics." (Ex. 1, col. 4:12-14; Ex. 2, col. 4:41-43) In addition,

23   the cited references include articles on algorithms "for 3D-graphics" and papers presented at

24

25

26   _____

27        [7] Other variations do not differ materially: e.g., to "reduc[e] a step of visibility
     computations in computer graphics" (Ex. 1, claims 11-27), to "reduc[e] visibility computations in
     3-D computer graphics," (Ex. 1, claims 28-64), to "process[] the visibility of 3-D surfaces before
28   a subsequent step of visibility computations" (Ex. 1, claims 65-68).

                                      -13-          DEFENDANT INTEL'S MOTION FOR JUDGMENT
                                                    ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

1    symposia "on Interactive 3D Graphics."  (Ex. 1, at pp. 2, 4, 5).  All these uses of the term "3D

2    graphics" plainly reference a field of use.[8]

3        By merely "limiting an abstract idea to one field of use," the challenged claims are

4    tantamount to saying simply, "apply the algorithm."  *Mayo*, 132 S. Ct. at 1301.  Indeed, the field-

5    of-use restriction here is even more transparent than in the claims rejected in *Mayo*.  There, the

6    natural law at issue was the correlation between the effects of specific thiopurine drug dosages on

7    a patient and given levels of blood metabolites.  The Supreme Court concluded that steps of

8    "administering" the drug and "determining" the metabolite levels were implicit in any use of the

9    law of nature by its intended audience (doctors) and so, added nothing beyond the instruction

10   "apply the law."  132 S. Ct. at 1297-98.  Here, by contrast, there is no need to look behind an

11   apparent application to discern the true nature of the claims.  There are no application steps—only

12   a series of calculations and a field-of-use statement:  "in 3D graphics."  In that respect, the claims

13   are more like *Mayo*'s archetypal exemplar of ineligible subject matter:  "a process consisting of

14   simply telling boat builders to refer to" Archimedes' principle of flotation "in order to determine

15   whether an object will float."  *Id.* at 1297.  Just as a claim saying "apply Archimedes' principle in

16   building a boat" is unpatentable, so are claims that say:  Apply an algorithm "in 3D graphics."[9]

17       Further confirming the absence of a specific application, the claims require no physical

18   output or programming result.  In every claim, the last method step recites either ignoring part of

19       [8] The '679 patent claims likewise contain only a single element limiting them to a
20   technological context—namely, that the method for reducing the visibility calculations is,
     according to the preamble, "required for the production of multi dimensional computer generated
21   images."  ('679, claims 1, 4 and 5.)  Producing three dimensional images is also not a specific
     application, but instead the objective of the entire field of 3D graphics, and thus is no more
22   limiting than the '047 patent's field-of-use statement.  (Ex. 2, col. 1:16 18 (The "basic" 3D
     graphics operation of visible surface detection is used to "generate images."); Ex. 3, Ex. B at 6
23   (Fuzzysharp's construction of "multi dimensional computer generated images" as "images
     generated by a computer conveying an impression of observing in three dimensions."); Ex. 4
24   (*IEEE Standard Glossary of Computer Graphics Terminology*, IEEE Std 610.6, at 21 (1991)),
     defining "three-dimensional graphics" in relevant part as, "[t]he presentation of data on a two-
25   dimensional display surface so that it appears to represent a three-dimensional model").

26       [9] It is of no moment that the algorithms here are narrower than Archimedes' principle.  "A
     patent upon a narrow law of nature may not inhibit future research as seriously as would a patent
27   upon Einstein's law of relativity, but the creative value of the discovery is also considerably
     smaller" and does not warrant the commensurate foreclosure of future innovation.  *Mayo*,
28   132 S. Ct. at 1303.  There is a "bright-line prohibition against patenting laws of nature,
     mathematical formulas, and the like" no matter how narrow the formulas may be.  *Id.*

visibility computations or completing those calculations without the unnecessary steps—nothing more.[10]  Claims mandating only the reduction of calculations, with no specific output, cover any application for which the calculations might be used.  These claims add even less to their abstract principle than does telling doctors to use the correlation between vaccine effectiveness and metabolite levels in administering the vaccine.  *See Mayo*, 132 S. Ct. at 1297.

Thus, just as the method of converting binary numbers in *Benson* would cover all computer applications of that algorithm, the claims at issue here would cover all applications of their algorithm in the field of "3D computer graphics."  The specification confirms the claims' unbounded scope:  their reach is not limited even to 3D computer graphics, but includes every field that uses visible surface detection, such as "radiosity calculations to compute the energy interactions between surfaces," "Hidden Surface Computations" for "computer animation, flight simulation or dynamic graphics," "Ray Tracing Computations,"[11] "Computer Vision,"[12] "virtual reality applications," and the "processing and display of scientific data such as energy spectra data."  (Ex. 1, col. 1:20-22, 15:33-41, 15:58-16:19, 16:21-59, 18:33-46, 18:46-48, 18:56-59.)  Even an algorithm restricted to a far narrower field of use would be unpatentable.  *Mayo*, 132 S. Ct. at 1301; *see Bilski*, 130 S. Ct. at 3230, 3231 (*Flook* invention not patentable even

---

[10] None of the final steps of the Asserted Claims go beyond either skipping part of, or carrying out, the visibility calculations.  In the '047 patent, claims 1-6 and 8-10 have the same final step of "ignoring" certain surfaces or their elements during the "visibility computation."  The final step of claims 11-13, 15-17, 20, 21, 23-25, and 27 is, in relevant part, "skipping" at a "step of visibility computations," "an occlusion relationship calculation."  For claims 46, 47, 49, 51, 54 and 55, it is "skipping at least an occlusion relationship calculation" at "subsequent steps" or "each of a subsequent step" of visibility computations…"  For claims 57-59 and 61-64, it is "ignoring" invisible 3-D surfaces or sub-elements in or during "visibility computation[s]."  For claims 65, 67 and 68, it is either "computing the visibility" of a geometric entity "before a subsequent step of visibility computations," or using the computed visibility information to "reduce" a computation in a "subsequent step of visibility computations."  In the '679 patent, claims 1, 4 and 5 all conclude, in relevant part, with "carrying out" "occlusion or invisibility relationship computations."

[11] Ray tracing is "[a] technique for displaying a three-dimensional object with shading and shadows, by tracing light rays backward from the viewing position to the light source, on a two-dimensional display surface."  Ex. 4 (*IEEE Standard Glossary of Computer Graphics Terminology*, IEEE Std 610.6, at 19 (1991)).

[12] "Computer vision is a field that includes methods for acquiring, processing, analyzing, and understanding images and, in general, high-dimensional data from the real world in order to produce numerical or symbolic information, e.g., in the forms of decisions."  Ex. 5 (http://en.wikipedia.org/wiki/Computer_vision, retrieved on March 12, 2013).

1    though it limited abstract principle "to the narrower domain of signaling dangers in operating a

2    catalytic converter" in the petrochemical and oil-refining industries).

3        **2.      The Claims Are Also Patent-Ineligible Because They Add Only
             Conventional Post-Solution Activity to the Abstract Formula**

4

5        The claims are also patent-ineligible for the independent reason that they add nothing to

6    the abstract steps beyond "'[p]ost-solution activity' that is purely 'conventional or obvious'."

7    *Mayo*, 132 S. Ct. at 1299 (quoting *Flook*).  Under *Mayo*, "putting the [abstract] formula to the

8    side," there must be an "'inventive concept' in the claimed application of the formula."  *Id.*  Here,

9    the claims simply recite determining what part of well-known visibility computations may be

10   omitted, omitting them, and carrying out the remaining computations as before.  They do not

11   alter, or even mention, the larger process of which those computations are a part.  As in *Flook*,

12   they are drawn to a mathematical formula and merely append conventional activity, which cannot

13   supply the "particular application" needed to impart patentability.  *Mayo*, 132 S. Ct. at 1299

14   (citing *Flook*).

15       The patents leave no doubt that the purported invention is to remove a part of standard

16   visibility calculations known in the prior art.  As the specification explains, "[v]isible surface

17   detection is one of the most basic operations in 3D graphics" for generating 3D images.  (Ex. 1,

18   col. 1:18-21, 2:25-41; Ex. 2, col. 1:16-18, 2:20-27.)  But the "standard strategy" and "current

19   techniques" for conducting visibility computations were supposedly "very slow."  (Ex. 1, col.

20   1:23-40; Ex. 2, col. 1:21-38.)  The patent purports to make them faster by computing the "surface

21   elements obviously visible or invisible to each other," and ignoring those elements, thereby

22   "reducing the visibility related computations."  (Ex. 1, col. 1:40-43, 2:21-44; Ex. 2, col. 1:38-40,

23   2:18-28.)

24       The claims confirm that conventional visibility computations follow the method steps.

25   Claim 1 of the '679 patent recites that the entire method is performed "prior to an occlusion or

26   invisibility relationship computation (*known per se*) being carried out."  (Ex. 2, col. 28:31

27   (emphasis added).)  The phrase "known per se" speaks for itself, and Fuzzysharp admitted in its

28   construction the well-known character of the computations:  "a person of ordinary skill in the art

-16-    DEFENDANT INTEL'S MOTION FOR JUDGMENT
        ON THE PLEADINGS, CASE NO. 12-cv-4413 YGR

having recognized knowledge of the prior-art." (Ex. 3, Ex. A at 1.)  It is thus explicit that what follows the method steps are visibility computations that would be performed even if the claimed method were not used.  In the '047 patent, the preamble of every claim identifies the method as one for "reducing" "visibility related computations."  "Reducing" signifies eliminating part of an existing computation, not performing a new computation.  Fuzzysharp's construction of "reducing" confirms this:  "decreasing *the number of operations or time used* for determining the visibility of one or more surfaces." (Ex. 3, Ex. A at 2 (emphasis added).)  The final step of every claim is to "skip" or "ignore" data before performing a visibility computation.  Thus, the claims merely require excluding a certain set of data, then carrying out the same prior art visibility computation that would occur in any event.

Under *Flook*, as endorsed in *Mayo*, such claims are not patent-eligible.  In *Flook*, it was known to calculate an alarm limit to signal dangers in the operation of a catalytic converter, and to use a computer to calculate those alarm limits.  *Id.* at 594.  The claimed process "provid[ed] an unpatentable [mathematical] formula" for calculating the alarm limit, while altering no other steps in the existing process.  *Mayo*, 132 S. Ct. at 1299 (quoting *Flook*, 437 U.S. at 586).  Because the claims "add[ed] nothing specific … other than what is well-understood, routine, conventional activity, previously engaged in by those in the field," "putting the abstract formula to the side, there was no 'inventive concept' in the claimed application of the formula."  *Id.* (quoting *Flook*, 437 U.S. at 594).  Likewise here, "all the other steps or at least the combination of those steps were … already in use."  *Mayo*, 132 S. Ct. at 1299.  It is not merely "obvious" but *required* to perform the remaining steps of "basic" visibility calculations needed to produce a 3D image. (Ex. 1, col. 1:18-21, 2:25-41; Ex. 2, col. 1:16-18, 2:20-27.)  And nothing could be more "conventional" than performing particular computations that would have occurred even without the claimed method.  These are exactly the sort of "token post-solution components" that "cannot transform an unpatentable principle into a patentable process."  *Mayo*, 132 S. Ct. at 1301, 1299, (quoting *Flook*, 437 U.S. at 589, 590) (brackets omitted).

-17-

### 3. Nothing in the Claims Not Previously Considered by the Federal Circuit Changes the Analysis

It remains the law under *Mayo* that the mere recitation of a general purpose computer does not render a claim patent eligible. *Mayo*, 132 S. Ct at 1301; *Bancorp*, 687 F.3d at 1278 (citing *Benson*, 409 U.S. at 67). This Court and the Federal Circuit have already found that claims 1 and 12 of the '047 patent and claims 1, 4 and 5 of the '679 patent contain only non-limiting general purpose computer structures, rather than a "specific machine." *3D Labs*, 2009 WL 4899215, at *4, 5 n.3; 447 Fed. Appx. at 184.

None of the components mentioned in claims that were not asserted in *3D Labs* alter this conclusion. The patents describe "z-buffers" as well-known components for storage and speed, a type of "fast memory" known in the prior art to be "simple" for storing depth and projection data. (Ex. 1, col. 1:47-53.) The patents never define or discuss a "quadtree"; they merely mention that, in one embodiment, "the data structure of the computer storage is *based on* a z-buffer or a quadtree." (Ex. 1, col. 2:57-58.) (emphasis added). The claims likewise recite these elements as general types of storage: "the structure of said computer storage is *based on* a z-buffer" or "*based on* a quadtree" (Ex. 1, claims 5, 17, and 51) (emphasis added). This is no more specific than the "high density removable storage means … *such as* a compact disc" that the Federal Circuit found insufficient to show a particular machine in *Bancorp*, 687 F.3d at 1274, 1277 (emphasis added), or the "reentrant shift register" of *Benson*, a physical computer memory component. *See Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1376 (Fed. Cir. 2011) (citing *Benson*, 409 U.S. at 73-74). Three of the four Asserted Claims that recite the z-buffer or quadtree are dependent claims that add them as a storage-type limitation for generic computer storage. (Ex. 1, claims 5, 17, and 51.) The remaining Asserted Claim that calls out the z-buffer contains no other physical structures ***at all***. (Ex. 1, claim 57) Adding a computer storage step, even one that names a particular type of storage component, to an otherwise unpatentable process, does not make it patent-eligible. *Id.* at 1375-76; *see Bancorp*, 687 F.3d at 1276-77. As for "cache memory," it is claimed only as a way to "speed[ ] up" the "visibility related computations" or "accelerate[ ]"

"computer storage." (Ex. 1, claims 10, 27, 55, 63.) Using a computer to permit a solution to be achieved more quickly also cannot confer patent-eligibility. *Bancorp*, 687 F.3d at 1278.

Further, these physical components cannot save the claims from invalidity under *Mayo*, independent of the "machine-or-transformation" test. *See* 132 S. Ct. at 1303 (noting that the machine-or-transformation test cannot "trump" the "'law of nature' exclusion"). The patents describe the z-buffer as part of the background art already used for visible surface detection, while the quadtree and cache are both well-known. (Ex. 1, col. 1:47-53; Ex. 6 (a "cache" is in relevant part "[a] small portion of high-speed memory used for temporary storage of frequently-used data")[13]; Ex. 7 (a "quadtree" is a data storage structure where each node has four children).)[14] As just noted, all are claimed for their general functions of storage and computing speed. They do not alter the conclusions that the claimed process adds only a field of use or token post-solution activity to its abstract steps. *Mayo*, 132 S. Ct. at 1294, 1297, 1301; *see Benson*, 409 U.S. at 67 (finding processes ineligible that "can be carried out in existing computers long in use, no new machinery being necessary").

### C. The Court Need Not Await Claim Construction Because the Claims Fail to Satisfy *Mayo* Even Assuming that Fuzzysharp's Constructions Are Correct

Intel expects that Fuzzysharp will urge the Court to defer a decision on this motion based on the Federal Circuit's statement that under "*Bilski* and our own more recent precedents, the patent eligibility of at least one of the asserted claims turns on questions of claim construction that the district court did not have the opportunity to address." 447 Fed. Appx. at 186. As discussed, in light of the existing findings as to these patents and Fuzzysharp's litigation history, the Court need not and should not wait. The Supreme Court's analysis in *Mayo*, which issued after the Federal Circuit's decision in *3DLabs*, is dispositive.

---

[13] *IEEE Standard Glossary of Computer Hardware Terminology*, IEEE Std. 610.10-1994, at 13.

[14] Paul E. Black, "quadtree" and "tree," in *Dictionary of Algorithms and Data Structures* [online], Paul E. Black, ed., U.S. National Institute of Standards and Technology. 16 November 2009. (accessed at http://xlinux.nist.gov/dads/HTML/quadtree.html and http://xlinux.nist.gov/dads/HTML/tree.html on March 12, 2013) (noting "original" definition based on 1998 article, [GG98] Volker Gaede and Oliver Günther, Multidimensional Access Methods, ACM Computing Surveys, 30(2):170-231, June 1998.)

Courts facing patentable subject-matter issues since *Mayo* have not hesitated to employ its standards to hold computer-aided claims unpatentable. For example, this Court recently relied on *Mayo* to grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6), finding claims on a computer-implemented gift-card redemption system ineligible. *Cardpool*, 2013 WL 245026. In its analysis, the Court invoked both the "inventive concept" standard of *Mayo* and the rule that a claim cannot merely state an abstract idea and simply add a requirement to "apply it." *Id.* at *1-*2 (citing *Mayo*, 132 S. Ct. at 1294). The Court rejected the patentee's suggestion that it should wait for the "flux" in Section 101 jurisprudence to settle before deciding the issue, because the "outcome of *CLS Bank* [a Section 101 case pending before the *en banc* Federal Circuit] cannot, of course, change the Supreme Court's reasoning and holdings in *Mayo* on which this order relies." *Id.* at *3; *see Bancorp*, 687 F.3d at 1279 (rejecting, under *Mayo*, claims to a method of managing life insurance policies).

Similarly, the Federal Circuit's suggestion that claim construction was necessary under the law as it stood in November, 2011 should not deter the Court from applying clear, controlling Supreme Court precedent handed down in 2012. *See OIP*, 2012 WL 3985118 at *16-*20 (applying *Mayo* standards to invalidate claims); *CyberFone*, 2012 WL 3528115, at *5-*6 (same); *Wildtangent, Inc. v. Ultramercial*, LLC, 657 F. 3d 1323 (Fed. Cir. 2011), *cert. denied,* 12 S. Ct. 2431 (U.S. May 21, 2012), (vacating and remanding, in light of *Mayo*, decision upholding computer-implemented claims in *Ultramercial, LLC v. Hulu, LLC*).

## V.     CONCLUSION

For the foregoing reasons, Intel respectfully requests that the Court grant it judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), dismissing this action with prejudice on the ground that the Asserted Claims are drawn to ineligible subject matter under 35 U.S.C. § 101.

Dated: March 15, 2013                        By:    _____/s/ Kenneth J. Halpern_____
                                                           Kenneth J. Halpern

                                                   Attorneys for Defendant and
                                                   Counterclaim-Plaintiff
                                                   INTEL CORPORATION

1

<u>**CERTIFICATE OF SERVICE**</u>

2

    I certify that, on March 15, 2013, I electronically filed the foregoing with the Clerk of the

3

United States Court for the Northern District of California by using the CM/ECF system.

4

5

                             */s/ Kenneth J. Halpern*
                                 Kenneth J. Halpern

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit K



U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

FEB - 8 1999

NANCY DOHERTY, CLERK
By _____
          Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AUTOMATED BUSINESS COMPANIES, §
INC.,                         §
                              §
          Plaintiff,          §
                              §
VS.                           §   NO. 4:98-CV-619-A
                              §
NEC AMERICA, INC., ET AL.,    §
                              §
          Defendants.         §

## MEMORANDUM OPINION
### and
### ORDER

Came on for consideration the motion of defendant NEC
America, Inc., ("NEC") for sanctions.  The court, having
considered the motion, the response of plaintiff, Automated
Business Companies, Inc., the reply, the record, and applicable
authorities, finds that the motion should be granted in part as
set forth herein.

I.

### Grounds of the Motion

NEC urges three grounds in support of its motion.  First,
plaintiff and its counsel violated Fed. R. Civ. P. 11 by failing
to perform a reasonable inquiry of the facts before filing the
complaint in this action.  Second, plaintiff and its counsel
violated 28 U.S.C. § 1927 by initiating and maintaining this
action for an improper purpose.  And, third, NEC is entitled to

recover attorney's fees pursuant to 35 U.S.C. § 285 as this is an exceptional case.

## II.

### Pertinent Facts

By letter dated February 9, 1998, David Fink ("Fink"), an attorney in Houston, Texas, wrote to the president of NEC enclosing a copy of the '797 Patent for his consideration for a non-exclusive license. The letter noted that plaintiff had sued thirteen different companies in January of 1997 and had reached agreements with them and two additional companies to obtain licenses. The letter stated that plaintiff hoped NEC would join the large family of licensees and that Fink "would appreciate learning if you believe that you do not need a license and your reasoning." The letter concluded with the threat that, if Fink had not gotten a response by March 17, 1998, he would assume NEC believed it had no need for a license and that if he disagreed he would "advise ABC, Inc., of its option." NEC responded by fax dated March 17, 1998, that its present facsimile products did not use the subject patent's technology and that NEC had no plans to use it at present. Nevertheless, NEC requested a copy of the license agreement available. There is no record of further correspondence, except that by letter dated April 10, 1998, counsel for Mita Copystar America, Inc., advised Fink that Mita,

a licensee, manufactured two fax machines for NEC and that no

further license under the '797 Patent was necessary for those

private label products.

On July 17, 1998, plaintiff filed its original complaint.

The complaint was signed by Jeffry Bodley ("Bodley") and listed

Fink as "of counsel."  With regard to NEC, plaintiff alleged:

> Defendant NEC has for a long time past been and
> still is infringing, actively inducing the infringement
> of, and contributorily infringing [United States Patent
> No. 4,837,797 (the "'797 Patent")] by, amongst other
> things, offering for sale, manufacturing and selling
> facsimile machines which infringe at least claim 1 of
> the '797 Patent by at least the NEC NEFAX 790 product
> and will continue to do so unless enjoined by this
> Court.

Pl.'s Compl. at 2, ¶ 8.

By letter dated September 11, 1998, NEC requested Fink to

send a claim chart setting out how he read each element of at

least claim 1 of the '797 Patent on the NEFAX 790 product.  In

response, Fink sent a fax stating that he was "puzzled by your

request."  The fax is a message typed at the bottom of a fax

cover sheet of Fink's law firm, which lists Bodley as "of

counsel."  Fink did not provide any further information.

By order signed September 21, 1998, the court directed the

parties to prepare and file a joint status report no later than

October 21, 1998.  The order required that, before filing the

report, the parties and their respective lead counsel meet face-

to-face to discuss settlement of the action.  On October 21, 1998, the parties filed their joint status report, which reflected that the settlement conference had taken place on October 20.  The status report also reflected that Fink was lead counsel for plaintiff.

At the settlement conference, defendant again inquired as to the basis for plaintiff's allegation that the NEFAX 790 product infringed plaintiff's patent.  Fink stated that they had relied on the fax specification information in the Buyers Laboratory, Inc.'s facsimile specification guide.  NEC's counsel handed Fink a photocopy of a page from the guide and asked if it contained the information used.  Fink and Dr. Charles Freeny ("Freeny"), plaintiff's president, examined the page and responded affirmatively.  NEC's counsel responded that the information contained in the guide was wrong.  NEC thereafter demonstrated the operation of the NEFAX 791, which had replaced the NEFAX 790, and the NEFAX 880 machines and proved that they did not infringe the '797 Patent.  Fink and Freeny requested copies of the operating manuals for those models.  The manuals confirmed that the equipment did not operate as disclosed in the guide.

By letter dated November 10, 1998, NEC forwarded a stipulation of dismissal to Fink.  Fink responded by fax dated November 12, 1998, acknowledging that the NEFAX 791 and NEFAX 880

4

models did not violate the patent in suit.  He proposed that plaintiff either dismiss its claims without prejudice or continue discovery to determine whether other NEC products might infringe its patent.  By fax dated November 18, 1998, Fink again requested information on an informal basis.  By letter dated November 20, 1998, NEC again stated that there was no legitimate basis for not dismissing the action with prejudice, at least with respect to the NEFAX 790, 791, and 880 models.  The letter enclosed a revised stipulation specifying those devices.  The letter concluded that failure of plaintiff to agree to the dismissal would result in a motion for sanctions.  Fink responded by fax dated November 20 that his client was unavailable and that Fink would be "out of town next week until Friday."  NEC responded that same day that a motion for sanctions would be prepared the following week.

On November 23, 1998, plaintiff noticed NEC's deposition and demanded production of related documents.  On November 25, 1998, NEC filed its motion for summary judgment.  On December 2, 1998, NEC served plaintiff with copies of its motion for sanctions and supporting brief, as required by Fed. R. Civ. P. 11.  On December 17, 1998, plaintiff filed its response to the motion for summary judgment, admitting that the NEFAX 790, 791, and 880 products do not infringe any claim of the '797 Patent.  Plaintiff did not

5

oppose the dismissal of its claims as to those products.

Plaintiff nevertheless urged the court that the action should be

maintained on its docket in order that plaintiff might engage in

a fishing expedition to determine whether any other NEC product

might infringe its patent.  Such request was wholly unsupported

and, by memorandum opinion and order and final judgment signed

December 18, 1998, the court granted NEC's motion for summary

judgment and dismissed plaintiff's claims with prejudice.

Plaintiff has not appealed from that judgment and the time for

doing so has expired.  Fed. R. App. P. 4.

### III.

### Rule 11

Rule 11 of the Federal Rules of Civil Procedure provides, in

pertinent part:

> **(b)  Representations to Court**.  By presenting to
> the court (whether by signing, filing, submitting, or
> later advocating) a pleading, written motion, or other
> paper, an attorney or unrepresented party is certifying
> that to the best of the person's knowledge,
> information, and belief, formed after an inquiry
> reasonable under the circumstances, —
>
> > **(1)**  it is not being presented for any
> > improper purpose, such as to harass or to cause
> > unnecessary delay or needless increase in the cost
> > of litigation;
> >
> > **(2)**  the claims, defenses, and other legal
> > contentions therein are warranted by existing law
> > or by a nonfrivolous argument for the extension,

6

>       modification, or reversal of existing law or the
>       establishment of new law;
>
>       **(3)** the allegations and other factual
>       contentions have evidentiary support or, if
>       specifically so identified, are likely to have
>       evidentiary support after a reasonable opportunity
>       for further investigation or discovery; and
>
>       **(4)** the denials of factual contentions are
>       warranted on the evidence or, if specifically so
>       identified, are reasonably based on a lack of
>       information or belief.

Fed. R. Civ. P. 11(b). The standard under Rule 11 is one of

reasonableness under the circumstances. <u>Business Guides, Inc. v.</u>

<u>Chromatic Communications Enters., Inc.</u>, 498 U.S. 533, 551 (1991).

   In a patent infringement case, a reasonable pre-filing

investigation includes an examination of the product accused of

infringement. <u>S. Bravo Sys., Inc. v. Containment Techs. Corp.</u>,

96 F.3d 1372, 1375 (Fed. Cir. 1996). Determining infringement

requires that the patent claims be interpreted and that the

claims be found to read on the accused devices. <u>Judin v. United</u>

<u>States</u>, 110 F.3d 780, 784 (Fed. Cir. 1997). Rule 11 sanctions

are appropriate where there is no evidence that plaintiff or his

attorney compared the accused devices with the patent claims

prior to filing suit. <u>Id.</u> As the Fifth Circuit has noted, Rule

11 requires that facts regarding a cause of action be developed

before the lawsuit is filed; a plaintiff cannot file suit hoping

that later discovery will uncover something. <u>Southern Leasing</u>

Partners, Ltd. v. McMullan, 801 F.2d 783, 787-89 (5th Cir. 1986).
Moreover, reliance on erroneous information does not justify a
meritless pleading when a reasonable investigation would have
revealed the error.  Traina v. United States, 911 F.2d 1155, 1157
(5th Cir. 1990); Chapman & Cole v. Itel Container Int'l B.V., 865
F.2d 676, 684-85 (5th Cir.), cert. denied, 493 U.S. 872 (1989)
(reliance on unverified hearsay is not a reasonable basis for
filing a lawsuit).

Here, plaintiff admits that suit was filed before a
reasonable effort was made to ascertain whether the accused
device infringed plaintiff's patent.  No adequate explanation has
been offered for why plaintiff failed to examine the accused
device, especially when it would have been so easy to do so.
Nevertheless, plaintiff did offer to dismiss its claims (even
though without prejudice), which in effect would have withdrawn
the challenged claims.  Fed. R. Civ. P. 11(c)(1)(A).  There is no
reason to believe that that offer was not still open at the time
the court granted the motion for summary judgment.  The court's
ruling came prior to the expiration of the twenty-one day period
of Fed. R. Civ. P. 11(c)(1)(A).  Plaintiff's nonopposition to the

8

motion for summary judgment as to the NEC NEFAX 790, 791, and 880 machines was an attempt to withdraw the challenged claims.[1]

Although the court finds the conduct of Fink and Bodley to be highly questionable, and although the court may initiate Rule 11 proceedings on its own initiative, the court has determined not to pursue the matter further at this time.

IV.

## 28 U.S.C. § 1927

NEC's second ground urges that sanctions are appropriate under 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

A suit must be both unreasonable and vexatious in order for sanctions under § 1927 to be imposed. FDIC v. Calhoun, 34 F.3d 1291, 1300 (5th Cir. 1994). An award under § 1927 may shift the entire financial burden of an action's defense only where the entire course of proceedings were unwarranted and should neither have been commenced nor persisted in. Browning v. Kramer, 931 F.2d 340, 345 (5th Cir. 1991). Although the materials submitted

---

[1] NEC had proposed a stipulation of dismissal with prejudice as to those claims.

9

in this case reflect that plaintiff's conduct was unreasonable, the court is not satisfied that NEC has shown that the suit was filed and continued for a vexatious purpose.

V.

### 35 U.S.C. § 285

Title 35, § 285 provides that the court may, in exceptional cases, award reasonable attorney's fees to the prevailing party in a patent infringement suit. Unjustified or frivolous litigation can form the basis for finding a case exceptional. Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989). Exceptional cases include those where a patentee continued a lawsuit even though it knew that the accused device did not infringe its patent. Hughes v. Novi American, Inc., 724 F.2d 122, 124-25 (Fed. Cir. 1984). Here, the circumstances demonstrate that the litigation was baseless. Accordingly, an award of attorney's fees under § 285 is proper. Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 455 (Fed. Cir. 1985).

The court finds that NEC would have ceased to incur expenses, including attorneys' fees, had it accepted plaintiff's offer to dismiss its claims without prejudice. Accordingly, the court is not awarding any attorneys' fees for that point in time forward. Although the court could probably determine the amount

to be awarded based on the affidavits on file, the court will ask
the attorneys to provide that information.

VI.

## O R D E R

For the reasons discussed herein, the court finds that
sanctions under Rule 11 and 29 U.S.C. § 1927 are inappropriate
but that this is an exceptional case under 35 U.S.C. § 285.
Accordingly,

The court ORDERS that:

(1)  NEC's motion for sanctions be, and is hereby, granted
to the extent NEC seeks recovery of attorneys' fees under 35
U.S.C. § 285;

(2)  by 4:30 p.m. on February 10, 1999, NEC file a document
stating the amount of attorneys' fees incurred by it in
connection with this litigation as of November 13, 1998;

(3)  by 4:30 p.m. on February 12, 1999, plaintiff file its
response, if any, contesting the accuracy of NEC's filing as to
attorneys' fees; and

11

(4)   the motion be, and is hereby, otherwise denied.

SIGNED February __8__, 1999.

JOHN McBRYDE
United States District Judge

# Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
EDWIN LYDA

                              Plaintiff,

          -v.-                                    10 Civ. 4773 (DAB)
                                                  ORDER

FREMANTLEMEDIA NORTH AMERICA, INC.

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
Deborah A. Batts, United States District Judge.

     On March 8, 2012, this Court dismissed Plaintiff Edwin

Lyda's Second Amended Complaint with prejudice and without leave

to replead.  Now before the Court is Lyda's Motion for

Reconsideration of that decision.  Additionally, Defendant

Fremantlemedia North America, Inc. ("Fremantle") moves for

attorneys' fees and sanctions pursuant to 35 U.S.C. § 285 and 28

U.S.C. § 1927.  For the reasons set forth herein, the Motion for

Reconsideration is DENIED and the Motion for Sanctions is

GRANTED.

     A. Motion for Reconsideration

     The standard for granting a motion to reconsider "is strict,

and reconsideration will generally be denied unless the moving

party can point to controlling decisions or data that the court

overlooked -- matters, in other words, that might reasonably be

expected to alter the conclusion reached by the court."  Shrader

v. CSC Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also

Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (holding that a motion for reconsideration "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court."). In addition, "The standards governing a motion to alter or amend judgment pursuant to Rule 59(e) and motions for reconsideration or reargument pursuant to Local Rule 6.3 are the same." Word v. Croce, No. 00 Civ. 6496, 2001 WL 755394, at * 2 (S.D.N.Y. July 5, 2001).

Furthermore, a motion for reconsideration is not one in which a party may reargue "those issues already considered when a party does not like the way the original motion was resolved." In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y. 1996). Thus Local Rule 6.3 should be "narrowly construed and strictly applied" to avoid repetitive arguments already submitted to the Court. National Congress for Puerto Rican Rights v. City of New York, 191 F.R.D. 52, 53 (S.D.N.Y. 1999) (citation omitted). Moreover, the parties "may not address facts, issues or arguments not previously presented to the Court," U.S. Titan v. Guangzhou Zhen Hua Shipping Co., Ltd., 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (citations omitted), because a motion to reconsider should never

2

act "as a substitute for appealing from a final judgment."
Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111,
113 (S.D.N.Y. 1997) (citation omitted).

Plaintiff, in the Motion for Reconsideration, does not argue
that this Court overlooked any relevant precedent.  While arguing
that Centillion Data Systems, LLC v. Qwest Communications Int'l,
Inc., 631 F.3d 1279 (Fed. Cir. 2011), demands a different result,
Plaintiff concedes that this Court expressly considered
Centillion in its decision granting Defendant's Motion to
Dismiss.  (See Mem. L. Mot. Recon., p. 2.)  Accordingly,
Plaintiff has put forth no valid ground for reconsideration, and
the Motion for Reconsideration is DENIED.

B.  Motion for Sanctions

"A court may award reasonable attorney fees to prevailing
parties under 35 U.S.C. § 285 if it finds, by clear and
convincing evidence, that the case is 'exceptional.'"  Computer
Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1379 (Fed.
Cir. 2008) (citing Beckman Instruments, Inc. v. LKB Produckter
AB, 892 F.2d 1547, 1541 (Fed. Cir. 1989).  An award of attorney's
fees is appropriate under Section 285 if the litigation is both
(1) brought in subjective bad faith; and (2) objectively
baseless.  Old Reliable Wholesale, Inc. v. Cornell Corp., 635
F.3d 539, 543-44 (Fed. Cir. 2011).  "When the accused infringer

3

prevails in the underlying action, factors relevant to the
inquiry include the closeness of the question, pre-filing
investigation and discussions with the defendant, and litigation
behavior." Computer Docking Station, 519 F.3d at 1379.

Here, each factor weighs in favor of a finding that the case
is "exceptional" under 35 U.S.C. § 285. The question of
infringement was not a close one, as Plaintiff continues to
argue, even on reconsideration, that Defendant may infringe
Plaintiff's patents without "providing a user input device," even
though that requirement is set forth explicitly in the patent
claims. Regarding pre-filing investigation, Plaintiff concedes
in opposition to the Motion for Sanctions that "Plaintiff has not
alleged that Defendant provides user input devices because such
information is not available publicly so there is no basis to
make such a statement as to that specific fact." (Pl.'s Br. Opp.
Mot. Sanctions, p. 4.) Plaintiff therefore acknowledges that
there was no good faith basis to assert this claim against
Defendant and that the lawsuit was filed with the knowledge that
Plaintiff could not allege a required part of the patent claims.
Thus, the litigation was objectively baseless. Plaintiff further
concedes that his entire claim was based on what it was
"reasonable to assume" Defendant's behavior would be, thus
demonstrating that this entire action was based on nothing more

4

than speculation.  Finally, communications from Defendant to

Plaintiff's Counsel demonstrate that Plaintiff's failure to

allege that Defendant infringed a necessary part of the patent

claims was called to the attention of Plaintiff's Counsel in

August of 2010.  (Manice Decl. Supp. Mot. Sanctions Ex. A.)

Nevertheless, Plaintiff continued to prosecute this case,

resulting in briefing on two separate Motions to Dismiss and a

frivolous Motion for Reconsideration.

Accordingly, this Court finds that this case is

"exceptional" pursuant to 35 U.S.C. § 285 and Defendant is

entitled to an award of reasonable attorney's fees.  The Motion

for Sanctions is GRANTED.  This matter is hereby referred to

United States Magistrate Judge Frank Maas for an inquest as to

reasonable attorney's fees.


SO ORDERED.

DATED:     New York, New York
           August 9, 2012


                              _____
                              DEBORAH A. BATTS
                              United States District Judge


                              5

# Exhibit M

Case3:12-cv-06375-JST   Document24-2   Filed03/28/13   Page64 of 82

CLOSED, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:10-cv-04773-DAB

Lyda v. Fremantlemedia North America              Date Filed: 06/18/2010
Assigned to: Judge Deborah A. Batts               Date Terminated: 03/08/2012
Cause: 35:271 Patent Infringement                 Jury Demand: Plaintiff
                                                  Nature of Suit: 840 Trademark
                                                  Jurisdiction: Federal Question

**Plaintiff**

**Edwin Lyda**                    represented by   **David Fink**
                                                  Fink & Johnson
                                                  7519 Apache Plume
                                                  Houston, TX 77071
                                                  (713)-729-4991
                                                  Fax: (713)-729-4951
                                                  Email: texascowboy6@gmail.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Fremantlemedia North America**  represented by   **Theresa M. Gillis**
                                                  Howrey LLP (NYC)
                                                  601 Lexington Avenue
                                                  New York, NY 10022
                                                  (212) 896-6500
                                                  Fax: (212)896-6501
                                                  Email: tgillis@mayerbrown.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Charles Deforest Manice**
                                                  Morgan Lewis & Bockius, LLP (NY)
                                                  101 Park Avenue
                                                  New York, NY 10178
                                                  (212)-309-6149
                                                  Fax: (212)-309-6001
                                                  Email: cmanice@morganlewis.com
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Jason C. White**
                                                  Morgan, Lewis & Bockius LLP
                                                  ( Chicago )

77 West Wacker Drive, 5th Floor
Chicago, IL 60601
(312) 846-5680
Fax: (312) 595-2250
Email: jwhite@morganlewis.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/18/2010 | 1 | COMPLAINT against Fremantlemedia North America. (Filing Fee $ 350.00, Receipt Number 907108)Document filed by Edwin Lyda.(rdz) (Entered: 06/21/2010) |
| 06/18/2010 | | SUMMONS ISSUED as to Fremantlemedia North America. (rdz) (Entered: 06/21/2010) |
| 06/18/2010 | | Magistrate Judge Frank Mass is so designated. (rdz) (Entered: 06/21/2010) |
| 06/18/2010 | | Case Designated ECF. (rdz) (Entered: 06/21/2010) |
| 09/13/2010 | 2 | NOTICE of First Amended Complaint. Document filed by Edwin Lyda. (Fink, David) (Entered: 09/13/2010) |
| 09/14/2010 | 3 | NOTICE of Notice of Service and Certificate of Service. Document filed by Edwin Lyda. (Attachments: # 1 Exhibit First Amended Complaint)(Fink, David) (Entered: 09/14/2010) |
| 09/14/2010 | 4 | NOTICE of Change of Email Address. Document filed by Edwin Lyda. (Fink, David) (Entered: 09/14/2010) |
| 09/14/2010 | 5 | NOTICE of Rule 7.1. Document filed by Edwin Lyda. (Fink, David) (Entered: 09/14/2010) |
| 09/16/2010 | 6 | NOTICE OF APPEARANCE by Theresa M. Gillis on behalf of Fremantlemedia North America (Gillis, Theresa) (Entered: 09/16/2010) |
| 09/16/2010 | 7 | NOTICE OF APPEARANCE by Charles Deforest Manice on behalf of Fremantlemedia North America (Manice, Charles) (Entered: 09/16/2010) |
| 09/17/2010 | 8 | MOTION for Jason C. White to Appear Pro Hac Vice. Document filed by Fremantlemedia North America.(mro) (Entered: 09/22/2010) |
| 09/23/2010 | 9 | ORDER FOR ADMISSIONPRO HAC VICE OFJASON C. WHITE, that Jason C. White is admitted to practice pro hac vice as counsel for defendant in the above captioned case in the United States District Court for the Southern District of New York. (Signed by Judge Deborah A. Batts on 9/23/10) (pl) (Entered: 09/23/2010) |
| 09/30/2010 | | CASHIERS OFFICE REMARK on 8 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 09/20/2010, Receipt Number 915467. (jd) (Entered: 09/30/2010) |
| 10/01/2010 | 10 | FILING ERROR - DEFICIENT DOCKET ENTRY - MOTION to Dismiss. Document filed by Fremantlemedia North America. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Affidavit Declaration of Charles D. Manice, # 2 Exhibit A to Manice Declaration, # 3 Exhibit B to Manice Declaration, # 4 Exhibit C to Manice Declaration, # 5 Exhibit D to Manice Declaration)(Gillis, Theresa) Modified on 10/5/2010 (db). (Entered: 10/01/2010) |
| 10/01/2010 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Theresa M. Gillis to RE-FILE Document 10 MOTION to Dismiss. ERROR(S): Supporting Documents (Declaration in Support) are filed separately, receiving their own document #. ***REMINDER*** - First Re-File Motion, then file and link any supporting documents. (db) (Entered: 10/05/2010) |
| 10/05/2010 | 11 | MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*. Document filed by Fremantlemedia North America.(Gillis, Theresa) (Entered: 10/05/2010) |
| 10/05/2010 | 12 | DECLARATION of Charles D. Manice in Support re: 11 MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*.. Document filed by Fremantlemedia North America. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Gillis, Theresa) (Entered: 10/05/2010) |
| 10/06/2010 | 13 | NOTICE OF APPEARANCE by Jason C. White on behalf of Fremantlemedia North America (White, Jason) (Entered: 10/06/2010) |
| 10/19/2010 | 14 | RESPONSE in Opposition re: 11 MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*.. Document filed by Edwin Lyda. (Fink, David) (Entered: 10/19/2010) |
| 10/29/2010 | 15 | REPLY MEMORANDUM OF LAW in Support re: 11 MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*.. Document filed by Fremantlemedia North America. (Gillis, Theresa) (Entered: 10/29/2010) |
| 10/29/2010 | 16 | DECLARATION of Charles D. Manice in Support re: 11 MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*.. Document filed by Fremantlemedia North America. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gillis, Theresa) (Entered: 10/29/2010) |
| 10/29/2010 | 17 | DECLARATION of Amanda Chacon in Support re: 11 MOTION to Dismiss , *or in the Alternative, Motion for a More Definite Statement*.. Document filed by Fremantlemedia North America. (Gillis, Theresa) (Entered: 10/29/2010) |
| 11/18/2010 | 18 | ENDORSED LETTER addressed to Judge Deborah A. Batts from David Fink dated 11/18/2010 re: Requesting a pre-motion conference. ENDORSEMENT: Denied. (Signed by Judge Deborah A. Batts on 11/18/2010) (jpo) (Entered: 11/18/2010) |
| 03/21/2011 | 19 | NOTICE OF CHANGE OF ADDRESS by Jason C. White on behalf of Fremantlemedia North America. New Address: Morgan Lewis & Bockius LLP, 77 West Wacker Drive, Chicago, Illinois, Cook 60601, (312) 324-1775. (White, Jason) (Entered: 03/21/2011) |
| 03/30/2011 | 20 | NOTICE of of Withdrawal of Appearance - Teresa M. Gillis re: 6 Notice of Appearance. Document filed by Fremantlemedia North America. (Gillis, |

| | | |
|---|---|---|
| | | Theresa) (Entered: 03/30/2011) |
| 04/06/2011 | 21 | NOTICE OF CHANGE OF ADDRESS by Charles Deforest Manice on behalf of Fremantlemedia North America. New Address: Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, New York, 10178-0600, 212-309-6000. (Manice, Charles) (Entered: 04/06/2011) |
| 07/14/2011 | 22 | MEMORANDUM & ORDER granting 11 Motion to Dismiss, filed by Fremantlemedia North America: Defendant's Motion to Dismiss is GRANTED and its Motion for a More Definite Statement is DENIED as moot. Plaintiff may file a Second Amended Complaint within 21 days of the date of this Order. Failure to file a Second Amended Complaint shall result in dismissal of this case, with prejudice. (Signed by Judge Deborah A. Batts on 7/14/2011) (ab) (Entered: 07/14/2011) |
| 07/27/2011 | 23 | SECOND AMENDED COMPLAINT amending 1 Complaint against Fremantlemedia North America with JURY DEMAND.Document filed by Edwin Lyda. Related document: 1 Complaint filed by Edwin Lyda.(mro) (ama). (Entered: 08/02/2011) |
| 08/02/2011 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney David Fink for noncompliance with Section 14.3 of the S.D.N.Y. Electronic Case Filing Rules & Instructions. E-MAIL the PDF for Document 23 Amended Complaint to: caseopenings@nysd.uscourts.gov. (mro) (Entered: 08/02/2011) |
| 08/08/2011 | 24 | MOTION to Dismiss *Plaintiff's Second Amended Complaint*. Document filed by Fremantlemedia North America.(Manice, Charles) (Entered: 08/08/2011) |
| 08/23/2011 | 25 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss *Plaintiff's Second Amended Complaint.*. Document filed by Edwin Lyda. (Fink, David) (Entered: 08/23/2011) |
| 09/02/2011 | 26 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss *Plaintiff's Second Amended Complaint.*. Document filed by Fremantlemedia North America. (Manice, Charles) (Entered: 09/02/2011) |
| 03/08/2012 | 27 | MEMORANDUM AND ORDER: granting 24 Motion to Dismiss. Plaintiff's Complaint fails to allege facts sufficient to state a patent infringement claim. Accordingly, Defendant's Motion to Dismiss is GRANTED. Plaintiff's Complaint is hereby DISMISSED with prejudice and without leave to replead. The Clerk of the Court is directed to CLOSE the docket in this case. SO ORDERED.(Signed by Judge Deborah A. Batts on 3/08/2012) (ama) (Entered: 03/08/2012) |
| 03/08/2012 | | Transmission to Judgments and Orders Clerk. Transmitted re: 27 Order on Motion to Dismiss,, to the Judgments and Orders Clerk. (ama) (Entered: 03/20/2012) |
| 03/15/2012 | 28 | FIRST MOTION Withdraw Grant of Motion to Dismiss and Deny it. Document filed by Edwin Lyda.(Fink, David) (Entered: 03/15/2012) |
| 03/20/2012 | 29 | CLERK'S JUDGMENT That for the reasons stated in the Court's Memorandum and Order dated March 8, 2012, Defendant's Motion to Dismiss is granted, and Plaintiff's Complaint is hereby dismissed with prejudice and |

| | | |
|---|---|---|
| | | without leave to replead; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/20/12) (Attachments: # 1 notice of right to appeal) (ml) (Entered: 03/20/2012) |
| 03/29/2012 | 30 | RESPONSE in Opposition re: 28 FIRST MOTION Withdraw Grant of Motion to Dismiss and Deny it.. Document filed by Fremantlemedia North America. (White, Jason) (Entered: 03/29/2012) |
| 03/30/2012 | 31 | REPLY to Response to Motion re: 28 FIRST MOTION Withdraw Grant of Motion to Dismiss and Deny it.. Document filed by Edwin Lyda. (Fink, David) (Entered: 03/30/2012) |
| 04/03/2012 | 32 | MOTION for Attorney Fees. Document filed by Fremantlemedia North America.(Manice, Charles) (Entered: 04/03/2012) |
| 04/03/2012 | 33 | DECLARATION of Charles D. Manice in Support re: 32 MOTION for Attorney Fees.. Document filed by Fremantlemedia North America. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Manice, Charles) (Entered: 04/03/2012) |
| 04/23/2012 | 34 | RESPONSE in Opposition re: 32 MOTION for Attorney Fees.. Document filed by Edwin Lyda. (Fink, David) (Entered: 04/23/2012) |
| 04/30/2012 | 35 | REPLY MEMORANDUM OF LAW in Support re: 32 MOTION for Attorney Fees.. Document filed by Fremantlemedia North America. (Manice, Charles) (Entered: 04/30/2012) |
| 08/09/2012 | 36 | ORDER: granting 32 Motion for Attorney Fees; denying 28 Motion 28 FIRST MOTION Withdraw Grant of Motion to Dismiss and Deny it. Accordingly, this Court finds that this case is "exceptional" pursuant to 35 U.S.C. § 285 and Defendant is entitled to an award of reasonable attorney's fees. The Motion for Sanctions is GRANTED. This matter is hereby referred to United States Magistrate Judge Frank Maas for an inquest as to reasonable attorney's fees. (Signed by Judge Deborah A. Batts on 8/9/2012) (ja) (Entered: 08/10/2012) |
| 08/09/2012 | | Transmission to Case Assignment Clerk. Transmitted re: 36 Order on Motion for Attorney Fees, Order on Motion for Miscellaneous Relief, to the Case Assignment Clerk for preparation of notice of case assignment/reassignment. (ja) (Entered: 08/14/2012) |
| 09/10/2012 | 37 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** SECOND MOTION for Reconsideration *Based on Two New CAFC Decisions*. Document filed by Edwin Lyda.(Fink, David) Modified on 9/20/2012 (ka). (Entered: 09/10/2012) |
| 09/10/2012 | 38 | SECOND MOTION for Reconsideration *Based on Two New CAFC Decisions:CORRECTED*. Document filed by Edwin Lyda.(Fink, David) (Entered: 09/10/2012) |
| 09/27/2012 | 39 | RESPONSE in Opposition re: 38 SECOND MOTION for Reconsideration *Based on Two New CAFC Decisions:CORRECTED*.. Document filed by Fremantlemedia North America. (Attachments: # 1 Exhibit 1)(Manice, Charles) (Entered: 09/27/2012) |
| 09/27/2012 | 40 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** |

| | | |
|---|---|---|
| | | OPPOSITION BRIEF *Opposing Defendant's Opposition Brief to Second Motion for Reconsideration*. Document filed by Edwin Lyda.(Fink, David) Modified on 9/28/2012 (ka). (Entered: 09/27/2012) |
| 09/28/2012 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney David Fink to RE-FILE Document 40 Opposition Brief. Use the event type Reply(non-motion) found under the event list Other Answers. (ka)** (Entered: 09/28/2012) |
| 09/28/2012 | 41 | FIRST REPLY MEMORANDUM OF LAW *IN RESPONSE TO OPPOSITION TO SECOND MOTION FOR RECONSIDERATION*. Document filed by Edwin Lyda. (Fink, David) (Entered: 09/28/2012) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/27/2013 13:44:05 | | | |
| **PACER Login:** | oh0026 | **Client Code:** | 015075-0002037-9572 |
| **Description:** | Docket Report | **Search Criteria:** | 1:10-cv-04773-DAB |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# Exhibit N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 02-60478-CIV-JORDAN

ALEXANDER S. ORENSHTEYN   )
      Plaintiff    )
          )
vs.          )
          )
CITRIX SYSTEMS, INC.,   )
      Defendant   )
_____ )

## ORDER

As explained below, Citrix's motion for sanctions against Mr. Orenshteyn, Mr. Fink, and Mr. Johnson [D.E. 337] is GRANTED IN PART.

## I. PROCEDURAL HISTORY

On April 9, 2002, Mr. Orenshteyn filed suit against Citrix, alleging that it "has for a long time past infringed and still is infringing, actively inducing the infringement of, and contributorily infringing at least claim 1" of the '942 and '569 patents. Citrix subsequently moved for summary judgment on the issues of non-infringement and invalidity. I ultimately agreed with Citrix, adopted its claim construction, and granted summary judgment in its favor on the infringement issue. I also granted in part Citrix's motion for sanctions under Rule 11 against Mr. Orenshteyn, Mr. Fink, and Mr. Johnson, and under 28 U.S.C. § 1927 against Mr. Fink and Mr. Johnson. The Federal Circuit disagreed with my claim construction on one issue and reversed both the grant of summary judgment and the award of Rule 11 sanctions. It also vacated and remanded the award of sanctions under § 1927, noting that only Mr. Fink and Mr. Johnson's failure to correct Mr. Orenshteyn's false testimony could serve as the basis for § 1927 sanctions under my previous order. *See Orenshteyn v. Citrix Systems, Inc.*, 341 Fed.Appx. 621 (Fed. Cir. 2009).

Citrix has moved anew for sanctions against Mr. Orenshteyn under the court's inherent powers and against Mr. Fink and Mr. Johnson under both § 1927 and the court's inherent powers, based upon Mr. Orenshteyn's false testimony and Mr. Fink's and Mr. Johnson's failure to correct it, as well as the discovery abuses that provide context for the false testimony, and the myriad ways proceedings were allegedly multiplied as a result of that testimony.

As a preliminary matter, Mr. Orenshteyn, Mr. Fink, and Mr. Johnson argue that Citrix cannot seek sanctions beyond the portion of § 1927 sanctions remanded to this court by the Federal Circuit, specifically that Citrix cannot seek sanctions under the court's inherent powers. I disagree. In the original sanctions order, I declined to reach the issue of whether sanctions were appropriate under the court's inherent powers. The Federal Circuit, therefore, did not have before it any sanctions determinations under that authority. The Federal Circuit has consistently held that "while a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *See Engel Industries, Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382 (Fed. Cir. 1999) (internal quotations omitted). *See also Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) ("issues actually decided on appeal – those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court – are foreclosed from further consideration"). Because sanctions under inherent powers were not "actually decided on appeal," the mandate does not foreclose my consideration of sanctions under that theory.

## II. Factual Background

Mr. Orenshteyn, together with his attorneys, attempted to circumvent discovery in this case and prevent Citrix from discovering Mr. Orenshteyn's basis for filing suit. When Citrix attempted to depose Mr. Orenshteyn as the person most knowledgeable about the patents and the basis for this suit, Mr. Orenshteyn alleged he had no information on the theories under which infringement was alleged and had not discussed the infringement allegations with his attorneys. In his deposition and in response to Citrix's first set of requests for admission, Mr. Orenshteyn stated under oath that he had not discussed with his attorneys any products made or sold by Citrix or whether Citrix would in fact be a named defendant in his lawsuit. As shown in the April 8, 2005, hearing, however, it turned out that prior to filing the complaint, he had actually spoken with his attorneys about Citrix and whether it had infringed on the patents at issue.

Mr. Orenshteyn testified that his deposition testimony that he did not discuss Citrix or its products with his attorneys "wasn't false, but . . . was . . . essentially answering the question based on my instructions that I'm not to include the information I got from my counsel." *See* April 8, 2005, Hearing Transcript at 54. At the hearing, Mr. Orenshteyn attempted to clarify the discrepancy between the deposition testimony and the hearing testimony by testifying that "[t]here was no

specific discussion, like, you know, when he told me that tomorrow we're going to file a complaint . . . . I knew that Mr. Fink was . . . studying Citrix . . .[but did not know whether Mr. Fink would actually file the complaint]." *Id.* at 56. At the hearing, Mr. Orenshteyn, again, rather disingenuously, testified that during the deposition he testified that he did not discuss Citrix with Mr. Fink because he "was under instructions not to discuss information that Mr. Fink provided to [him] . . . in privileged communications," but that prior to the lawsuit he did know that "Mr. Fink . . . had documentation and [Fink & Johnson] had access to an installation of Citrix." *Id.* at 56. Similarly, Mr. Orenshteyn attempted to account for his testimonial discrepancies by observing that at the deposition he testified that he had not "*discussed* Citrix with Mr. Fink" whereas at the April 8, 2005, hearing he testified that he had a phone *conversation* about Citrix with Mr. Fink prior to filing the lawsuit. He explained that he "did not consider the discussion. I considered the conversation -- a discussion for me would have been, like, you know, technical discussion about the merits." *Id.* at 57. In other words, Mr. Orenshteyn testified that the questions posed at the deposition and then at the April 8, 2005, hearing were different, and accordingly yielded different responses from him.

Similarly, and in accordance with Mr. Orenshteyn's testimony that only his attorneys knew anything regarding the infringement allegations, Mr. Orenshteyn's response to interrogatories regarding infringement allegations and claim constructions was that such answers were protected by attorney-client privilege. Citrix then tried to depose Mr. Orenshteyn's attorneys, Mr. Fink and Mr. Johnson, to determine the substance of Mr. Orenshteyn's allegations. To avoid the deposition, Mr. Fink and Mr. Johnson sought a protective order and, when that was denied, sought reconsideration of the denial. In seeking the protective order, Mr. Fink and Mr. Johnson claimed that "[t]here is no issue in this case which requires Orenshteyn to rely upon his attorney's advice." When the protective order was denied a second time, Mr. Orenshteyn then offered to supplement his discovery responses with the relevant information.

Based on Mr. Orenshteyn's allegations that he was the only person with discoverable information regarding the patents (since he claimed his attorneys' knowledge and information were protected by attorney-client privilege and the work product doctrine) and that he knew literally nothing regarding the infringement allegations, Citrix moved for sanctions against Mr. Orenshteyn and his attorneys for filing a frivolous lawsuit. I held an evidentiary hearing on the motion for

sanctions at which Mr. Orenshteyn and his attorneys clarified that they had investigated and discussed the infringement allegations prior to filing suit and Mr. Orenshteyn had simply mislead Citrix's attorneys as to those conversations. Stuck between admitting that Mr. Orenshteyn had perjured himself and admitting he had filed a lawsuit without investigating the claims, Mr. Fink began a series of semantic contortions.

Q.      Okay. Did you ever provide Mr. Orenshteyn with a written opinion concerning Citrix?

A.      No.

Q.      Did Mr. Orenshteyn authorize you to file the – the initial complaint against Citrix in this matter?

A.      Yes.

Q.      He did that before you filed the initial complaint?

A.      Yes.

. . .

Q.      And while Mr. Orenshteyn testified [at his deposition], he testified that he had never discussed Citrix with you prior to the filing of this complaint, correct?

A.      I believe that's what he testified.

Q.      Was Mr. Orenshteyn lying when he testified so?

A.      I don't think so.

Q.      Was he being untruthful when he testified so?

A.      I don't think so.

Q.      Was he incorrect when he testified so?

A.      Yes.

Q.      Did you ever do anything to correct that testimony in this litigation?

A.      No.

Q.      Did Mr. Orenshteyn ever do anything . . . to correct that false testimony during this litigation?

A.      No.

Q.      Did you discuss with Mr. Orenshteyn the fact that his testimony regarding whether he had discussed Citrix with you prior to filing this lawsuit was false?

Mr. Johnson:   Objection. You've made two references to the testimony being false. He said it was incorrect. I don't think he ever said it was false.

Q.      Was his testimony regarding that he had never discussed Citrix with counsel, with you, prior to filing this lawsuit false?

A.      I don't know what you mean by false. It was incorrect.

Q.      It wasn't true, was it?

A.      It was not true.

Q.      Okay. Did you ever discuss that fact with him?

A.      Yes.

4

Q.     Did you ever discuss there was a need to correct that in this lawsuit, the fact that he had given incorrect testimony.

A.     He had not given incorrect testimony. That's what he remembered. That's how he remembered it.

Q.     Did you ever discuss with Mr. Orenshteyn the need to correct his – his testimony that was not true regarding whether he had discussed Citrix with you prior to filing this lawsuit?

A.     For him, it was true. That's the way he remembered it. It was not untrue.

Q.     Yes or no. Mr. Fink?

A.     Well, you're calling it un – you know, you're making out that --

Q.     All right. Let's –

A.     -- told something --

Q.     He test --

A.     -- knowingly, and that's not the case.

Q.     He testified that he never discussed Citrix with you prior to filing the lawsuit, correct?

A.     Yes.

Q.     That's not true, is it?

A.     That's right.

. . .

Q.     Did he testify that he did not know whether you conducted an investigation to determine whether Citrix infringed his patents before you filed suit on his behalf against Citrix?

A.     Right.

Q.     Right. He did testify so, correct?

A.     He said no.

Q.     And that was incorrect, was it not, Mr. Fink, his testimony, according to you here today?

A.     It's a yes or no question, Mr. Fink.

A.     I don't know what was in his mind. Maybe you do, but I don't know.

Q.     It's an inaccurate statement, isn't it, Mr. Fink? Is his testimony correct, according to you?

A.     His testimony is what he knew and remembered at that time, and that's what he knew and remembered at that time. So --

Q.     According to you, he did know whether you had investigated Citrix before he filed his lawsuit correct?

A.     I don't know if he remembered at that time.

Q.     . . . According to you, he did know?

A.     Yes, that is true.

Q.     Okay. Did you ever do anything to let the court know what Mr. -- Mr. Orenshteyn's testimony here was incorrect?

A.     No.

. . .

Q.      Did you discuss [with Mr. Orenshteyn] the need to correct his testimony?

A.      Not directly.

Q.      Did you let Mr. Orenshteyn know that he should let the court -- or Citrix know that his testimony was incorrect?

A.      I've explained to you that his testimony was based upon his memory at that time, and his memory was that he did not know whether or not we made an investigation.  His memory was -- as he reported was correct.  It just happens that he remembered it wrong.

Q.      So the answer is no?

A.      I don't know what you mean by correct or inaccurate.  His -- his --

Q.      His testimony was inaccurate, correct?

A.      His testimony was inaccurate.

*See* Fink Depo. at 78-88.  At the evidentiary hearing, Mr. Fink continued:

Q.      . . . Do you know of any reason that would have impaired Mr. Orenshteyn's testimony – ability to testify truthfully at his deposition in this case?

A.      I thought he testified truthfully.  I don't know what you are talking about.  I don't understand the question.

Q.      Right.  So, is everything he said, you believed it to be true at the time, correct?

A.      No.  I said that he testified truthfully.  It was the truth as he understood it and how he interpreted the questions under the circumstances.

Q.      But I understand you think he misremembered certain things, is that your position?

A.      I thought he may have misremembered it.  And he clarified today that he – he understood my instructions to him in a way that I didn't intend them to be understood.

Q.      And you never took steps during the course of the litigation to correct the record, correct?

A.      The record is correct.  I've testified to this during the deposition.  And I pointed out in the deposition that was taken of me that, in my opinion, Mr. Orenshteyn testified correctly and truthfully as he understood it.  And for me to come and say, "No, he didn't testify truthfully; this is the truth," would be a contradiction.

Q.      Was all of Mr. Orenshteyn's testimony factually accurate?

A.      To him it was.

Court:  That's not the question.

A.      I don't know.

Court:  You were -- Mr. Fink, this is just getting worse and worse for you.  Some of the questions put to Mr. Orenshteyn had to do with discussions or dialogue, as you put it, between your firm and him, so you were part of that.  That

| | means you know whether or not some of his testimony was accurate or not. He's not asking you whether Mr. Orenshteyn thought it was accurate. |
|---|---|
| A. | Oh, well, I don't understand what he's asking me. It was not accurate as I understand it, -- and -- |
| Q. | Did you take any steps to correct the record so that the testimony would be accurate? |
| A. | I did not believe that it was necessary to correct the record, because as I explained, he was giving his understanding of things. And that was the point of the questions, is what he understands. |
| Q. | You took no steps to correct the record, correct? |
| A. | I'm sorry? |
| Q. | You took no steps to correct the record, correct? |
| A. | I was not at liberty to correct the record. |
| Q. | Which means you took no steps to correct the record, isn't that correct? Yes or no, Mr. Fink. |
| A. | No, it is not correct. |
| Q. | Why? |
| A. | I discussed it with Mr. Orenshteyn, and he said that's what he understood. And, therefore, that was the extent that I could -- I could take steps to correct the record. I could not do anything beyond that. |

. . .

| Court: | Let me ask you something, Mr. Fink. You're telling me that if you're aware that your client is testifying falsely in a deposition, you have no obligation to correct that testimony? |
|---|---|
| A. | Your Honor, if I thought that he was testifying falsely, I would have a duty to correct the record. He was testifying as he understood things and as he understood the questions. |
| Court: | He's asked whether or not he discussed Citrix with you, and he says no. That's not false? |
| A. | That's correct, we did not discuss it. I told him information. It was a monologue. There was no back and forth, this and that, and so forth. |

April 8, 2005, Hearing Trans. at 75-78.

### III. LEGAL STANDARD AND ANALYSIS

Citrix seeks sanctions against Mr. Fink and Mr. Johnson under 28 U.S.C. § 1927 and against

Mr. Orenshteyn, Mr. Fink, and Mr. Johnson[1] under the court's inherent powers.

---

[1]     Mr. Fink and Mr. Johnson argue that Citrix's motion should be dismissed for effecting service of process late. Citrix, however, responded with an email sent to Mr. Fink on February 19. Additionally, Mr. Fink and Mr. Johnson obviously received the motion with adequate

## A.  28 U.S.C. § 1927

The text of 28 U.S.C. § 1927 is as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The statutory language makes clear that this sanctioning mechanism is aimed at the unreasonable and vexatious multiplication of proceedings.  "[U]nder § 1927 attorneys obligated to avoid dilatory tactics throughout the entire litigation. . . . [U]nlike Rule 11 "awards pursuant to § 1927 may be imposed only against the offending attorney; clients may not be saddled with such awards.'" *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001).

The plain language of the statute imposes three essential requirements of an award of sanctions:

> First, the attorney must engage in "unreasonable and vexatious" conduct.  Second, that "unreasonable and vexatious" conduct must be conduct that multiplies the proceedings."  Finally, the dollar amount of the excess proceedings, i.e., the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

*Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th 1997).  The Eleventh Circuit "has consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'"  *Amlong & Amlong*, 457 F.3d at 1190 (quoting *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991)).  Bad faith, for purposes of § 1927, turns on the attorney's objective conduct.  *Id.* ("it is clear from the statutory language and the case law that . . . bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct").  "The term 'unreasonably' necessarily connotes that the district court must compare the attorney's conduct against the conduct of a 'reasonable' attorney and make a judgment about whether the conduct was acceptable according to

---

time to respond since they not only responded, but responded in depth.

some objective standard. The term 'vexatiously' similarly requires an evaluation of the attorney's objective conduct." *Id.* 1190-91

Accordingly, "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly or malevolently." *Id.* at 1191. In other words, "a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings." *Id.*[2] An attorney's conduct, however, "must be particularly egregious to warrant the imposition of sanctions – the attorney must knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim." *Id.* Mere negligence will not suffice– that is, "an attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney." *Id.*

Mr. Fink and Mr. Johnson "needlessly obstructed the litigation" of this action through their conduct and discovery practices that were tantamount to an elaborate game of Three-Card Monte. When Citrix asked Mr. Orenshteyn to explain the basis of its suit, Mr. Orenshteyn claimed that his attorneys knew the basis. When Citrix attempted to depose the attorneys, they sought a protective order claiming attorney-client privilege. When the protective order was denied, they claimed Mr. Orenshteyn had answers and offered to supplement his discovery responses. Furthermore, Mr. Fink and Mr. Johnson had a duty to correct Mr. Orenshteyn's false testimony and deliberately did not do so. At the hearing regarding Mr. Orenshteyn's false testimony and Mr. Fink's and Mr. Johnson's dilatory approach to the discovery process, Mr. Fink testified that he knew at the time of Mr. Orenshteyn's deposition that he had testified inaccurately, but took no steps to correct the testimony.[3]

---

[2] As to the objectivity of a district court's analysis under § 1927, the *Amlong & Amlong* panel explained that "although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be 'unreasonabl[e] and vexatious[]' if it is done with a malicious purpose or intent." 457 F.3d at 1991-92.

[3] Mr. Johnson has never argued that he should not be liable for the failure to correct testimony, even though Mr. Fink was the attorney present at the deposition when the false statements were made. Regardless, Mr. Johnson was the attorney of record for Mr. Orenshteyn and thus should have been aware of his clients false statements and should have corrected them.

There can be no doubt that this conduct was egregiously reckless and that it multiplied the proceedings.

At the April 2005 hearing, Mr. Orenshteyn testified that the answers he gave at the deposition to questions regarding his lack of knowledge about Citrix and his lack of discussions with Fink & Johnson about Citrix were designed to preserve attorney-client privilege. But the answers elicited during Mr. Orenshteyn's deposition were to questions to which Mr. Fink did not object, and throughout the deposition, Mr. Fink went to great lengths to prevent Mr. Orenshteyn from answering questions that might divulge privileged information. Accordingly, I find the attorney-client privilege explanation to be disingenuous at best.

When questioned about Mr. Orenshteyn's testimony at the April 2005 hearing, Mr. Fink engaged in an absurd game of semantics. When asked about the truthfulness of Mr. Orenshteyn's deposition testimony, Mr. Fink attempted to claim that Mr. Orenshteyn had testified "correctly," but "inaccurately" and that, while he had not believed Mr. Orenshteyn's testimony to be "true at the time," he had "testified truthfully." He then attempted to claim that Mr. Orenshteyn's testimony was "correct" because he had not "discuss[]" the infringement allegations with Mr. Orenshteyn, instead he had "told [Mr. Orenshteyn] information. It was a monologue." April 8, 2005, Hearing Trans. at 75-78.

Throughout the hearing, however, Mr. Fink firmly agreed that he had made no attempt to correct the record. As I stated in my previous order, an attorney's failure to correct the false testimony of his client is, at a bare minimum, reckless. An attorney who then goes on to debate the differences between inaccuracy, falsehood, and untruthfulness -- given that his client had crafted his answers to preserve allegedly privileged information, and given that the attorney while present at the deposition objected to certain questions as privileged and expressly permitted others -- is, in my view, tantamount to bad faith (regardless of whether there was subjective intent to engage in vexatious litigation). Mr. Fink's and Mr. Johnson's failure to correct the record does not shield them from sanctions under §1927. Indeed it only worsens their position, as that inaction "unreasonably and vexatiously" multiplied the proceedings leading up to summary judgment, as well as the proceedings related to the previous motions for sanctions and attorneys' fees. *See Amlong & Amlong*, 457 F.3d at 1190. Accordingly, I find that sanctions against Mr. Fink and Mr. Johnson

10

under § 1927 are appropriate here for the failure to correct Mr. Orenshteyn's testimony as part of their overall gamesmanship in discovery.

## B. Inherent Powers

Citrix also moves for sanctions against Mr. Orenshteyn, Mr. Fink, and Mr. Johnson under the court's inherent powers. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "This power is derived from the court's need 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Byrne*, 261 F.3d at 1106 (quoting *Chambers*, 501 U.S. 32 at 43. "With this in mind, [the Eleventh Circuit has held] that before a court can impose sanctions on an attorney under its inherent powers, it must make a finding of bad faith." *Amlong & Amlong*, 457 F.3d at 1202. *See also Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) ("[B]efore a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct 'constituted or was tantamount to bad faith.'" (quoting *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 918 (11th Cir.1982))); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir.1995). Put differently, a court has the power to "assess attorneys' fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Byrne*, 261 F.3d at 1106 (internal citations and quotation marks omitted). Thus, "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Id.* (internal citations and quotation marks omitted).

As to the conduct of Mr. Fink and Mr. Johnson, "[a] district court's authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers." *Amlong & Amlong*, 457 F.3d at 1189 (citing to *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1178 n. 6 (11th Cir. 2005). Thus, "[i]f the sanctions [are] permissible under § 1927, then they [are] proper, and there is no need to examine whether the sanctions [are] also permissible under the court's inherent powers." *Id.* Accordingly, for the reasons set forth in the § 1927 analysis above, I find sanctions are also justified against Mr. Fink and Mr. Johnson under my inherent powers.

As to Mr. Orenshteyn, I find that he was an integral part of the discovery antics providing the basis of Mr. Fink and Mr. Johnson's sanctions. Mr. Orenshteyn personally testified inaccurately in

11

his deposition and failed to correct his testimony. Mr. Orenshteyn also participated in the ruse of refusing all discovery requests with claims of attorney-client privilege, thereby necessitating more discovery and more discovery disputes. Mr. Orenshteyn's testimony and refusal to answer questions regarding the patent claims certainly multiplied proceedings. In addition to spending time and resources on Mr. Orenshteyn's deposition, Citrix also was forced to seek depositions of Mr. Fink and Mr. Johnson because of Mr. Orenshteyn's failure to answer. It was then forced to defend against both the resultant motion for protective order and the motion for reconsideration of the denial of the protective order. Additionally there have now been two rounds of motions for sanctions, one of which involved an evidentiary hearing. Because I find that Mr. Orenshteyn acted in bad faith by testifying inaccurately at his deposition and failing to correct that testimony, and because I find that this action multiplied proceedings, I find sanctions against Mr. Orenshteyn are warranted under the court's inherent powers.

Citrix has asked that, rather than imposing monetary sanctions against Mr. Orenshteyn, I dismiss this case. I decline to take that drastic step at this stage. Only monetary sanctions will be imposed against Mr. Orenshteyn at this juncture.

### IV. CONCLUSION

Citrix's motion for sanctions against Mr. Fink and Mr. Johnson under 28 U.S.C. § 1927 and against Mr. Fink, Mr. Johnson, and Mr. Orenshteyn under the court's inherent powers [D.E. 337] is GRANTED IN PART. The matter is referred to Magistrate Judge McAliley for a report and recommendation as to the determination of the amount of sanctions.

DONE and ORDERED in chambers in Miami, Florida, this 30th day of September, 2010.

_Adalberto Jordan_
Adalberto Jordan
United States District Judge

Copy to:        All counsel of record
                Magistrate Judge McAliley

12